## HAYES-ALBION CORPORATION v KUBERSKI

Docket No. 67897. Argued April 7, 1983 (Calendar No. 18).—Decided
December 28, 1984. Released January 29, 1985. Rehearing de-
nied *post,* 1202.

Hayes-Albion Corporation brought an action in the Bay Circuit
Court against Michael A. Kuberski and Robert F. Lunger,
National Pattern and Model Company, International Silicone
Corporation, and Erie Marking Tool Company, alleging that
the defendants had misappropriated trade secrets and confiden-
tial information, and that Kuberski had violated a trade secrets
agreement entered into at the time he was hired by Hayes-
Albion. The plaintiff sought an injunction to prevent the defen-
dants from using the trade secrets and from engaging in unfair
competition and sought damages for lost profits and unjust
enrichment. The court, Elza H. Papp, J., granted a permanent
injunction and awarded compensatory, exemplary, and unjust
enrichment damages to the plaintiff. The Court of Appeals,
Beasley, P.J., and R. B. Burns and Hoehn, JJ., affirmed (Docket
No. 48114). The defendants appeal.

In a unanimous opinion by Justice Levin, the Supreme Court
*held:*

The plaintiff is entitled to actual and unjust enrichment

---

REFERENCES FOR POINTS IN HEADNOTES

[1-4] 55 Am Jur 2d, Monopolies, Restraints of Trade, and Unfair
Trade Practices § 704 *et seq.*

Employee's duty, in absence of express contract, not to disclose or
use in new employment special skills or techniques acquired in
earlier employment. 30 ALR3d 631.

Former employee's duty, in absence of express contract, not to
solicit former employer's customers or otherwise use his knowl-
edge of customer lists acquired in earlier employment. 28 ALR3d
7.

[3] 42 Am Jur 2d, Injunctions §§ 75-77, 112, 118.

Propriety of permanently enjoining one guilty of unauthorized use
of trade secrets from engaging in sale or manufacture of device in
question. 38 ALR3d 572.

[4] 55 Am Jur 2d, Monopolies, Restraints of Trade, and Unfair Trade
Practices §§ 547, 553, 554.

Proper measure and elements of damages for misappropriation of
trade secret. 11 ALR4th 12.

damages and to injunctive relief because the defendants appropriated and used its trade secrets.

1. A precise definition of a trade secret has eluded judicial formulation. A trade secret may consist of any formula, pattern, device, or compilation of information which is used in a business and which provides an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating, or preserving materials, a pattern for a machine or other device, or a list of customers. Several factors to be considered in determining whether particular information is a trade secret which, although not comprehensive, provide a point of beginning for the inquiry are the extent to which the information is known outside the business, the extent to which it is known by employees and others involved in the business, the extent of measures taken to guard the secrecy of the information, the value of the information to the business and to its competitors, the amount of effort or money expended in developing the information, and the ease or difficulty with which the information could be properly acquired or duplicated by others.

2. In this case, the information regarding the plaintiff's equipment and industrial processes is a trade secret. The plaintiff expended time, money, and effort to develop the processes and equipment; the processes and equipment gave plaintiff a competitive edge; the plaintiff took measures to keep the processes and equipment secret; and it would take someone with normal skill in the industry years of hard work to develop similar equipment and processes. Specific information regarding development of processes to solve the special needs of particular customers is also a trade secret. Because these specialized solutions gave the plaintiff a competitive edge, it kept that information secret. When defendant Kuberski dealt with certain of the plaintiff's former customers after he left the plaintiff's employ, and used techniques that the plaintiff had developed specifically for its customers, he was misusing secret processes that he had obtained solely because of his position as the plaintiff's chief engineer. The defendants were properly enjoined from using that information although the injunction went too far in enjoining the defendants from dealing with the plaintiff's former customers without regard to whether they were using secret processes in providing for the customers' needs.

3. The information regarding the identity of the plaintiff's customers is more problematic. In general, there is nothing

improper in an employee establishing his own business and communicating with customers for whom he had formerly done work in his previous employment. Because of his position as plaintiff's chief engineer, Kuberski learned about the peculiar needs of particular clients. This information increased Kuberski's ability to compete with the plaintiff. Although such information is not a trade secret at common law, an employer may have a protectable interest in information about client needs that an employee gains by virtue of his employment. However, a customer has a right to deal with the person he chooses, and the remedy for the use of information about client needs in violation of an agreement respecting the employee's providing services to the customer after termination of employment, such as the agreement in this case, is money damages. To enjoin the employee from providing services would unnecessarily infringe upon the customer's exercise of choice of with whom the customer wishes to deal.

4. The information regarding sources of supply is perhaps most difficult of all to characterize. The plaintiff experimented with materials and solutions to determine how to make the best product at the cheapest cost. The defendants purchased materials from the plaintiff's suppliers to manufacture the same products made by the plaintiff through use of the same processes employed by the plaintiff. The trial court's injunction was again overly broad, however, to the extent that it enjoined defendants from purchasing supplies from the plaintiff's suppliers.

5. Information may qualify as a trade secret although others possess it. The extent to which information is known by outsiders is but one factor to be considered in determining whether the information is a trade secret. It would be unduly burdensome to require the plaintiff to prove a negative to make out a prima facie case. Because production processes in the plaintiff's industry are closely guarded, it would be most difficult for the plaintiff to demonstrate that no competitor used the plaintiff's trade secrets. In this case, the plaintiff presented sufficient evidence to make out a prima facie case. The defendants did not present evidence demonstrating that the information the plaintiff sought to protect was common knowledge.

6. The plaintiff is entitled to recover as actual damages the profits made by International Silicone. In addition, the plaintiff may recover damages for unjust enrichment for the supply order Kuberski diverted to Erie Tool and National Pattern. Kuberski violated a fiduciary duty by diverting the orders, and the suppliers knowingly participated in the violation. The

plaintiff may not, however, recover exemplary damages for compensation it paid to Kuberski while he devoted his efforts to International Silicone, even if actual and unjust enrichment damages do not provide complete compensation.

Affirmed in part and reversed in part.

108 Mich App 642; 311 NW2d 122 (1981) affirmed in part and reversed in part.

1. PATENTS — TRADE SECRETS.

A trade secret may consist of a formula, pattern, device, or compilation of information used in a business which provides an opportunity to gain an advantage over competitors who do not know or use it; in determining whether particular information is a trade secret, a court, as a point of beginning for inquiry, should consider the extent to which the information is known outside the business and by employees and others in the business, the extent of measures taken to guard its secrecy, the value of the information to the business and to its competitors, the amount of effort or money expended in development of the information, and the ease or difficulty with which the information could properly be acquired or duplicated by others.

2. PATENTS — TRADE SECRETS.

Information may qualify as a trade secret even though it is possessed by others; the extent to which information is known outside a business is but one factor to be considered.

3. INJUNCTIONS — TRADE SECRETS.

An injunction that prevented defendants from using misappropriated trade secrets was overbroad in also enjoining the defendants from dealing with the plaintiff's former customers without regard to whether the trade secrets were used in providing the customers' needs, from using knowledge of who the customers were and what their needs were because it infringed upon the customers' exercise of choice with respect to with whom it wishes to deal, and from purchasing supplies from the plaintiff's suppliers.

4. PATENTS — TRADE SECRETS — DAMAGES.

Information regarding the particular needs of a business' clients, while not a trade secret at common law, may be a protectable interest; where an employee who agreed not to use such information gained by virtue of his employment to compete with the business nonetheless uses it to compete after termination of employment, the remedy is money damages.

*E. Frank Cornelius* for the plaintiff.

*Marsh & Marsh* (by *Henry G. Marsh* and *T. Michael Marsh)* for the defendants.

Amicus Curiae:

*Reising, Ethington, Barnard, Perry & Brooks* (by *Owen E. Perry); (Fitzgerald, Young, Peters, Dakmak & Bruno,* by *Marilyn Naiman-Kohn,* of counsel) for Thermofil, Inc.

LEVIN, J. The defendants, the former chief engineer and the former chief tool supplier of the plaintiff, appeal a decision of the Court of Appeals affirming a decision of the trial court that the defendants appropriated and used trade secrets of the plaintiff, and granting plaintiff a permanent injunction and compensatory, exemplary, and unjust enrichment damages. Having determined that the trial court's findings are adequately supported in the record, we affirm the decisions of the Court of Appeals and of the trial court on the questions of unjust enrichment and actual damages, but reverse on the question of exemplary damages, and modify the injunction so that it does not bar the defendants from earning a living in the field in which they have expertise or from doing business with customers or suppliers of the plaintiff.

I

As in many trade secret cases,[1] the issues in this case are primarily factual. The voluminous record yields the following outline of the events that led to this litigation.

Plaintiff, the Gladen Division of Hayes-Albion

---

[1] See *Sanitas Nut Food Co v Cemer,* 134 Mich 370, 371; 96 NW 454 (1903).

Corporation, manufactures four silicone rubber products necessary to perform hot stamp decorating: silicone rubber sheets, molded silicone rubber dies, silicone rubber rollers, and silicone rubber sleeves. Broadly speaking, hot stamp decorating is an art that involves the transfer of a colored design from a thin color coated cellophane or mylar carrier tape to a plastic part. Through the use of a heat, time, and pressure cycle, the design is integrated with the plastic part. Hot stamp decorating is widely used in the automobile industry *(e.g.,* to apply dashboard finishes), in the appliance industry *(e.g.,* to mark control dials), in the packaging industry *(e.g.,* to decorate cosmetic containers), and in other large industries.

The manufacture of silicone rubber products for hot stamp decorating is a specialized, competitive industry, in which secrecy about manufacturing processes is particularly important and widely maintained. There is little commercially available technical literature on the manufacture of silicone rubber products for hot stamp decorating, and it would be most difficult, it has been said virtually impossible, to reverse engineer the silicone rubber products that plaintiff manufactures.

In the manufacture of silicone rubber products, plaintiff employs equipment, methods, techniques, and processes that its employees, particularly its founder, Carl Gladen, have developed over a number of years. These methods, techniques, processes, and items of equipment have been derived from costly and lengthy experimental research. Plaintiff's technological prowess is respected world-wide, and plaintiff has received offers to purchase processes that it has developed.

Plaintiff has chosen neither to sell nor to patent its technology because it wishes to safeguard the technology from competitors. Plaintiff also guards

the secrecy of its technology by impressing upon its employees that plaintiff's methods, equipment, and processes should not be disclosed to unauthorized persons. The plaintiff's manual contains a secrecy clause, and Gladen regularly instructs employees about the importance of maintaining silence. Although much of plaintiff's technology is embodied in a manufacturing procedures manual, commonly referred to within the company as the "Bible," employees are forbidden to remove that document from the plant premises. All visitors to the plant must register with the receptionist. In addition, when plaintiff works on a project for a customer, plaintiff retains possession of any molds developed for that customer and does not divulge to the customer the procedures developed to meet the customer's needs.

Attracted to plaintiff because of its superior technology, defendant Michael Kuberski wrote to Gladen in 1972 applying for employment with plaintiff. On October 17, 1973, plaintiff hired Kuberski as chief engineer, responsible for tool design and inspection. Approximately one week later, Kuberski signed an invention assignment agreement and a trade secret agreement similar to agreements Kuberski had signed in his previous employment with RCA. Plaintiff would not have retained Kuberski in its employ had he not signed those agreements.

Although Kuberski was acquainted with the use of silicone rubber products when he began work with plaintiff, he had no experience in the manufacture of silicone rubber products. While employed with plaintiff, Kuberski had access to plaintiff's manufacturing procedures manual and worked closely with Gladen and other of plaintiff's employees to refine those procedures and to meet the requirements of specific customers. For exam-

ple, Kuberski and Gladen helped Globe Union to resolve a problem with the design on Die Hard batteries that others in the industry had been unable to solve. Kuberski also conducted tests to determine what selection and combination of materials would produce the best product at the lowest cost.

During this period, Gladen reminded Kuberski of the importance of keeping plaintiff's technology secret. That Kuberski understood the need for secrecy is evidenced both by his own statements and by his instructions to other employees to be careful during their telephone conversations with customers.

Kuberski met defendant Lunger while working for plaintiff. Lunger controlled defendant National Pattern and Model Company and defendant Erie Marking Tool Company. As chief engineer for plaintiff, Kuberski was responsible for finding sources of tooling and determining the placement of tooling orders. In the fourteen months after Kuberski and Lunger first met, Kuberski caused plaintiff to become dependent upon Lunger, through Erie and National Pattern, for at least 80% of all its tooling. Before Kuberski and Lunger met, plaintiff had done less business with Erie and had done no business with National Pattern.

In October of 1976, without informing plaintiff, Kuberski and Lunger signed articles of incorporation for defendant International Silicone Corporation, a corporation organized to compete with plaintiff using the processes set forth in plaintiff's "Bible." Plaintiff became suspicious of Kuberski when Kuberski asked to examine the invention assignment and trade secret agreements he had signed, but Kuberski allayed plaintiff's fears a few weeks after he asked to see the agreements by stating that although he thought that "some op-

portunity might come up," that it was a "dead issue." Relying on Kuberski's assurances, plaintiff continued to provide Kuberski access to confidential information and contact with important customers, and to order plaintiff's tool machinery from Lunger. Although plaintiff asked Kuberski to find sources of tool machinery other than Lunger, Kuberski failed to do so. Kuberski continued to place orders with Erie and National Pattern, which had a shop rate of $20 per hour, when he could have placed the orders with Tri-City Tool & Die Co, Inc., which was located next door to plaintiff and which had a shop rate of $14 per hour. Further, while still employed by plaintiff, Kuberski ordered parts and supplies for International Silicone and, without informing plaintiff, went to Houston to investigate a method of improving upon one of plaintiff's processes that International Silicone intended to use. Kuberski took one of plaintiff's roller molds without signing for it, and kept it for several months before returning it. Kuberski continued to work for plaintiff until January 31, 1977, at which time he resigned and informed his supervisor that he would not be involved in competitive activities.

After Kuberski left plaintiff's employ, defendants proceeded to engage in competition with plaintiff, using equipment, processes, and formulas similar to plaintiff's. For example, defendants used a machine similar to the sizing machine that Gladen invented, used plaintiff's primer formula for bonding silicone rubber to metal, and used plaintiff's method for making silicone rubber dies out of matrix molds. Defendants also communicated with plaintiff's customers and performed services for clients such as Globe Union employing techniques that plaintiff had developed specifically for those clients. Defendants purchased virtually

the same supplies used by plaintiff, and quoted prices just below plaintiff's.

## II

Defendants raise several issues on appeal: was the trade secrets agreement signed by Kuberski one week after employment valid; did plaintiff have trade secrets that defendants used in violation of plaintiff's rights; does plaintiff have the burden of proving that its alleged trade secrets are not known to others in trade; does the evidence support the trial court's finding that plaintiff is entitled to lost profits as a result of sales made by defendants; were defendants Lunger, Erie Marking Tool, and National Pattern unjustly enriched because of Kuberski's placement of business with them; was plaintiff entitled to exemplary damages; did the trial court err in excluding the testimony of Ray Flynt on a separate record; should a permanent injunction have been issued; and should the trial judge have granted defendants' motion for new trial. We address those issues sequentially.

## A

Kuberski signed a trade secrets agreement with plaintiff on October 24, 1973, one week after he was employed. The agreement provided as follows:

"I agree not to communicate or disclose to any person, either directly or indirectly or under any circumstances or at any time, any knowledge or information whatsoever acquired by me during the period of my employment relating to or concerning the Company's inventions, trade secrets, systems or any other confidential information regarding the property, business and affairs of the Company or any of its subsidiaries without the written consent of the Company, and I agree

not to utilize or make available any such knowledge or information, either directly or indirectly, in connection with the soliciting of or the acceptance of employment with any competitor of the Company."

Defendants contend that the agreement is violative of the statute which provides that "[a]ll agreements and contracts by which any person, co-partnership or corporation promises or agrees not to engage in any avocation, employment, pursuit, trade, profession or business, whether reasonable or unreasonable, partial or general, limited or unlimited, are hereby declared to be against public policy and illegal and void." MCL 445.761; MSA 28.61.

Stating that "[a]lthough one has the right to change jobs and use his learned skills, he does not have the right to disclose trade secrets," 108 Mich App 642, 649; 311 NW2d 122 (1981) (citing *Allis-Chalmers Mfg Co v Continental Aviation & Engineering Corp,* 255 F Supp 645, 653 [ED Mich, 1966]), the Court of Appeals held that Kuberski's agreement with plaintiff was valid and enforceable. We affirm that holding.

In *Glucol Mfg Co v Schulist,* 239 Mich 70, 74; 214 NW 152 (1927), this Court held that the statute relied on by defendants has no application where the plaintiff is not seeking to prevent the former employee from engaging in a similar business, but to prevent him from using the secret knowledge of his former employer. That decision is in accord with the construction that courts in other states have placed on trade restriction statutes with similar language.[2] Applied to this case, the rule of *Glucol* is that although Kuberski is free

---

[2] See, *e.g., State Farm Mutual Automobile Ins Co v Dempster,* 174 Cal App 2d 418; 344 P2d 821 (1959) (interpreting California Business & Professions Code, § 16600).

to compete with plaintiff using his general skill or knowledge, he may not use plaintiff's trade secrets.

Absent an agreement specifically prohibiting disclosure of trade secrets, Kuberski would be prohibited by the common law from disclosing trade secrets. *O W Thum Co v Tloczynski,* 114 Mich 149, 157-158; 72 NW 140 (1897). See also *Dutch Cookie Machine Co v Vande Vrede,* 289 Mich 272, 279-280; 286 NW 612 (1939); *Glucol Mfg Co v Schulist, supra.* We now turn to the question of what information possessed by plaintiff should be considered a trade secret.

## B

A precise definition of a trade secret has eluded judicial formulation. In *Glucol,* p 75, this Court stated that a trade secret is "a secret formula or process not patented but known only to certain individuals using it in compounding some article of trade having a commercial value, and does not denote the mere privacy with which an ordinary commercial business is carried on." The Restatement of Torts, § 757, Comment b, provides useful guidelines that have been widely adopted.[3] The Restatement states:

"A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers."

The Restatement then goes on to list several fac-

---

[3] See, *e.g., Cherne Industrial, Inc v Grounds & Associates, Inc,* 278 NW2d 81, 89-90 (Minn, 1979); *Elcor Chemical Corp v Agri-Sul, Inc,* 494 SW2d 204, 211 (Tex Civ App, 1973).

tors to be considered in determining whether particular information is a trade secret:

"(1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others."

This list of factors, although not comprehensive, provides a point of beginning for the inquiry.[4]

When applying the above guidelines to the facts of the instant case it is helpful to distinguish among the various kinds of information that plaintiff seeks to protect. We will consider separately information regarding plaintiff's equipment and industrial processes, information regarding customer identity, information regarding customer problems, information regarding the resolution of customer problems, and information regarding sources of supply.

Information regarding the specialized equipment and industrial processes that plaintiff used to manufacture silicone rubber rollers, silicone rubber sheets, molded silicone rubber dies, and silicone rubber sleeves is most readily characterized. The record provides ample support for the trial court's conclusions that plaintiff expended time, money

[4] This Court applied similar guidelines in *Manos v Melton,* 358 Mich 500, 508; 100 NW2d 235 (1960), and *Russell v Wall Wire Products,* 346 Mich 581, 590-591; 78 NW2d 149 (1956). The *Manos* and *Russell* guidelines remain valid, and may be relied on in appropriate circumstances. The factors to be employed, and the weight attached to each factor will vary depending on the facts of a particular case.

and effort to develop the processes and equipment, that the processes and equipment gave plaintiff a competitive edge, that plaintiff took measures to keep the processes and equipment secret, and that it would take someone with normal skill in the industry four years of hard work to develop similar equipment and processes. We therefore agree that the information regarding the equipment and industrial processes is a trade secret.

The information regarding the identity of its customers is more problematic. Ninety-nine percent of International Silicone's business ($146,393 of $147,431) came from former customers of Gladen. Kuberski appears to be correct, however, that he did not "steal" a list of customers that plaintiff had kept secret. Kuberski had significant customer contact while employed with plaintiff, and he kept the names and addresses of customers in a personal memo book, as he had done in his previous employment with RCA. In general, there is nothing improper in an employee establishing his own business and communicating with customers for whom he had formerly done work in his previous employment.[5]

Because of his position as plaintiff's chief engineer, Kuberski learned about the peculiar needs of particular clients. This information increased Kuberski's ability to compete with plaintiff, and raises issues similar to those resolved by this Court in the related cases of *Follmer, Rudzewicz & Co, PC v Kosco* and *Nolta-Quail-Sauer & Associates v Roche,* 420 Mich 394; 362 NW2d 676 (1984). There we recognized that although such informa-

[5] See Anno: *Former employee's duty, in absence of express contract, not to solicit former employer's customers or otherwise use his knowledge of customer lists acquired in earlier employment,* 28 ALR3d 7.

tion is not a trade secret at common law,[6] an employer may have a protectable interest in information about client needs that an employee gains by virtue of his employment. We recognized further, however, that a customer has a right to deal with the person he chooses, and that the remedy for the use of information about a client's needs in violation of an agreement respecting the employee providing services to the customer after termination of employment, is money damages. To enjoin the employee from providing services would unnecessarily infringe on the customer's exercise of choice in the person with whom the customer deals.

If a secret *process* is involved, a plaintiff is entitled to the protection provided trade secrets, including an injunction. In this case, plaintiff performed specialized work for its clients and spent time developing processes to solve their special needs. Because these specialized solutions gave plaintiff a competitive edge, it kept that information secret. When Kuberski dealt with Globe Union and Classic Games after he left plaintiff's employ, and used techniques that plaintiff had developed specifically for those customers, he was misusing secret processes that he had obtained solely because of his position as plaintiff's chief engineer. Specific information regarding resolution of the problems of particular customers is a trade secret, and the defendants were properly enjoined from using that information although the injunction went too far in enjoining the defendants from dealing with the customers without regard to whether it was using secret processes in providing for their needs.

The information regarding sources of supply is

_____

[6] See, generally, *International News Service v Associated Press,* 248 US 215; 39 S Ct 68; 63 L Ed 211; 2 ALR 293 (1918).

perhaps most difficult of all to characterize. Plaintiff experimented with materials and solutions to determine how to make the best product at the cheapest cost. To the extent that defendants purchased from plaintiff's suppliers materials to manufacture the same products made by plaintiff through use of the same processes employed by plaintiff, defendants are seeking to reap where they have not sown.[7] The trial court's injunction was again overly broad, however, to the extent that it enjoined defendants from purchasing supplies from plaintiff's suppliers. Defendants should be able to purchase from plaintiff's suppliers.

## C

Defendants argue that plaintiff cannot claim a trade secret unless it demonstrates that others do not have the information. We reject this claim for two reasons. First, information may qualify as a trade secret although others possess it. The extent to which information is known by outsiders is but one factor to be considered in determining whether the information is a trade secret.[8]

Second, it would be unduly burdensome to require the plaintiffs to prove a negative to make out a prima facie trade secrets case. Production processes in the silicone rubber industry are closely guarded, and it would therefore be most difficult for a plaintiff to demonstrate that no competitor used the plaintiff's trade secrets. As discussed in subpart B, a plaintiff can claim a trade secret if it shows that the information it seeks to protect has the characteristics outlined in the Restatement. In this case, plaintiff presented sufficient evidence to

---

[7] See, *e.g.*, *Trilog Associates, Inc v Famularo*, 455 Pa 243; 314 A2d 287 (1974).

[8] See fn 7 discussion in Part B.

make out a prima facie case. If defendants could have presented evidence demonstrating that the information plaintiff sought to protect was common knowledge, defendants might have rebutted that prima facie case. Defendants did not do so.

D

Defendants also contend that the evidence does not support the trial court's finding that plaintiff is entitled to lost profits as a result of sales made by International Silicone. Far from being clearly erroneous, the trial court's findings are well substantiated in the record. The profits made by International Silicone represent actual damages, and plaintiff should be able to recover.

E

Whether Lunger, Erie Tool, and National Pattern were unjustly enriched because of Kuberski's placement of business with them when Kuberski worked for plaintiff is similarly a question of fact. Substantial evidence supports the trial court's finding that despite requests by plaintiff to find alternative sources of supply, Kuberski diverted business to Erie Tool and National Pattern. Kuberski had not informed plaintiff that he and the other defendants were planning on competing with plaintiff, and he conceded at trial that if he had been the division manager of plaintiff and knew that his chief engineer and chief tooling supplier were planning to form a competing company that he would not have allowed tooling orders to be placed with that company. Although Lunger, Erie Tool, and National Pattern provided plaintiff with good service, their rates were higher than those of other tool suppliers in the area.

In *L A Young Spring & Wire Co v Fall,* 307 Mich 69, 106-107; 11 NW2d 329 (1943), this Court said that " '[o]ne who knowingly joins a fiduciary in an enterprise where the personal interest of the latter is or may be antagonistic to his trust becomes jointly and severally liable with him for the profits of the enterprise' " (quoting *Irving Trust Co v Deutsch,* 73 F2d 121 [CA 2, 1934]). Professor Scott declared:

"Where a person in a fiduciary relation to another violates his duty as fiduciary, a third person who participates in the violation of duty is liable to the beneficiary. If the third person makes a profit through such participation, he is chargeable as constructive trustee of the profit so made." Scott, Trusts, p 3568, § 506.

In the instant case, Kuberski violated his fiduciary duty to plaintiff, and Lunger, Erie, and National Pattern knowingly participated in that violation. Plaintiff is entitled to unjust enrichment damages in addition to actual damages.

F

Since *Ross v Leggett,* 61 Mich 445; 28 NW 695 (1886), the purpose of exemplary damages in Michigan has not been to punish the defendant, but to render the plaintiff whole. When compensatory damages can make the injured party whole, this Court has denied exemplary damages. *Veselenak v Smith,* 414 Mich 567; 327 NW2d 261 (1982).

In the instant case, plaintiff contends on appeal that recovery of the profits made by International Silicone and unjust enrichment damages from Lunger, Erie, and National Pattern will not fully compensate it for the damage it has suffered. Plaintiff argues that those amounts do not compensate it for time that Kuberski devoted to Inter-

national Silicone while he was being paid by plaintiff. Although plaintiff may be entitled to be compensated for such loss, compensation therefor is not properly granted as exemplary damages.

## G

We agree with the Court of Appeals that the trial court did not abuse its discretion in refusing the proffered testimony of Ray Flynt. Flynt was not on the list of witnesses exchanged by counsel before trial, and whether he should have been permitted to testify at trial was for the trial court to decide in the exercise of discretion.

## H

In *Allis-Chalmers Mfg Co v Continental Aviation & Engineering Corp,* 255 F Supp 645, 654 (ED Mich, 1966), the court emphasized the importance of striking the "proper balance between the public policy of Michigan, as declared in [MCL 445.761; MSA 28.61], of protecting and encouraging the right of the individual to pursue his livelihood in the vocation he chooses, including the right to migrate from one job to another, and the rights of an employer to its accumulated body of trade secrets obtained by the expenditure of great amounts of time and money."[9] Defendants contend, and we agree, that the trial court lost sight of that balance when drafting the injunction.

The trial court ordered that defendants

---

[9] See also McClain, *Injunctive relief against employees using confidential information,* 23 Ky L J 248, 253-255 (1935); *Peerless Pattern Co v Pictorial Review Co,* 147 AD 715; 132 NYS 37 (1911); *New Method Laundry Co v MacCann,* 174 Cal 26; 161 P 990 (1916); *Menter Co v Brock,* 147 Minn 407; 180 NW 553; 20 ALR 857 (1920); *Byers v Trans-Pecos Abstract Co,* 18 SW2d 1096 (Tex Civ App, 1929).

"are enjoined permanently from engaging, directly or indirectly, in the manufacture of silicone rubber products for hot stamp decorating, or advising, directly or indirectly, any third parties about such manufacture, for the reason that, unless so restrained, they inevitably will continue to disclose, use and exploit for their own benefit, plaintiff's trade secrets and confidential information regarding the manufacture of silicone rubber products for hot stamp decorating."

This formulation is too restrictive because it prohibits defendants from competing with plaintiff even if plaintiff's trade secrets become common knowledge,[10] and even if defendants develop different processes than those used by plaintiff. The overbreadth of the injunction effectively prevents defendants from earning a living in the field in which they have expertise.

The overbreadth of the injunction also affects customers by denying them the opportunity to deal with the defendants.[11] The rights of innocent third parties should not be sacrificed in formulating a remedy, especially since the plaintiff's right to relief is based on the fiduciary relationship

[10] See *Schulenburg v Signatrol, Inc,* 33 Ill 2d 379; 212 NE2d 865 (1965), *cert den* 383 US 959 (1966) (duration of injunction limited to time required to duplicate product by lawful means); *Winston Research Corp v Minnesota Mining & Mfg Co,* 350 F2d 134 (CA 9, 1965) (once trade secret becomes public, everyone is entitled to use the information). See, also, Anno: *Propriety of permanently enjoining one guilty of unauthorized use of trade secret from engaging in sale or manufacture of device in question,* 38 ALR3d 572; Dobbs, Remedies, § 10.5, pp 698-699.

[11] Courts should consider the effect that an injunction will have on third parties. See 4 Restatement Torts, 2d, §§ 933, 936, 942; *Loma Portal Civic Club v American Airlines, Inc,* 61 Cal 2d 582, 588; 394 P2d 548; 39 Cal Rptr 708 (1964); *Diaz v Kay-Dix Ranch,* 9 Cal App 3d 588; 88 Cal Rptr 443 (1970); *Huggins v Wake County Bd of Ed,* 272 NC 33; 157 SE2d 703 (1967) (quoting with approval *Jones v Lassiter,* 169 NC 750; 86 SE 710 [1915]). See also *Lucy Webb Hayes Nat'l Training School v Goeghegan,* 281 F Supp 116 (D DC, 1967).

between the employer and the employee.[12] Although the plaintiff's trade secrets should be protected, innocent third parties, to the extent possible, should be left unaffected by the dispute between the former employer and the former employee.

The right of customers to choose their suppliers is obviously restricted by the absolute bar in the injunction on the manufacture of silicone rubber products. The fear of becoming entangled in a lawsuit enforcing the injunction also chills the customer's choices. Both of these factors should be reconsidered in redrafting the injunction.

Although plaintiffs are entitled to injunctive relief, the injunction should be drafted more narrowly. Defendants should be enjoined from disseminating plaintiff's trade secrets, and from using plaintiff's trade secrets to manufacture, or aid in the manufacture of, silicone rubber sheets, dies, rollers, or sleeves. The injunction should remain in force until such time as defendants can demonstrate that plaintiff's information has become common knowledge.

## III

If a litigant believes a judge to be biased, he may move to disqualify the judge pursuant to GCR 1963, 912. Defendants did not file such a motion.

The trial judge apparently formed a negative opinion of defendants during the course of the trial, as is reflected in her comments from the bench:

"The only conclusion the court can reach from all the

---

[12] See *EI DuPont de Nemours Power Co v Masland*, 244 US 100, 102; 37 S Ct 575; 61 L Ed 1016 (1917); *Franke v Wiltschek*, 209 F2d 493 (CA 2, 1953); McClintock, Evidence, § 152, p 406; Dobbs, Remedies, § 10.5, pp 695-696.

evidence produced is . . . that Kuberski and Lunger are modern day pirates and rogues, totally devoid of any moral or ethical virtues, and that they are totally unworthy of belief."

Although such an expression of indignation may have been excessive, it does not disqualify the judge.

## IV

In conclusion, plaintiff is entitled to both damages and injunctive relief because defendants appropriated and used its trade secrets. We affirm the Court of Appeals grant of actual damages and unjust enrichment damages. On the issues of exemplary damages and injunctive relief, we remand to the trial court for proceedings consistent with this opinion.

WILLIAMS, C.J., and KAVANAGH, RYAN, BRICKLEY, CAVANAGH, and BOYLE, JJ., concurred with LEVIN, J.