**FRONTIER CORPORATION and
Frontier Communication
Services, Inc., Plaintiffs,**

v.

**TELCO COMMUNICATIONS GROUP,
INC., Kim Hakim, David Morrissey
and Stephen Canton, Defendants.**

No. IP 97–0433–C H/G.

United States District Court,
S.D. Indiana,
Indianapolis Division.

May 9, 1997.

N. Kent Smith, Hall Render Killian Heath & Lyman, Indianapolis, IN, and Norman C. Ankers, Honigman Miller Schwartz & Cohn, Detroit, MI, for plaintiffs.

Philip A. Whistler, Ice Miller Donadio & Ryan, Indianapolis, IN, for defendants Telco Communications Group, Inc. and Stephen Canton; John R. Maley and Susan Zoeller, Barnes & Thornburg, Indianapolis, IN, for defendants Kim Hakim and David Morrissey.

### ENTRY ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

HAMILTON, District Judge.

Plaintiffs Frontier Corporation and Frontier Communication Services, Inc. (together, "Frontier") have sued three former employees and the competitor that now employs them on claims arising from alleged violations of the employees' contracts that included obligations not to solicit Frontier's customers or employees and obligations to preserve the confidentiality of Frontier's proprietary information. Frontier seeks preliminary injunctive relief on several counts, and the court heard evidence on the matter on April 23 and 24, 1997. As explained in detail below, Frontier has shown a strong likelihood of succeeding on the merits of its claims that defendant Kim Hakim has violated her contract with Frontier by soliciting her former customers with Frontier and by stealing and misusing Frontier's confidential customer information. Injunctive relief is appropriate to prevent further violations. In addition, because Hakim's actions were undertaken with the knowledge and approval of defendants David Morrissey and Telco Communications Group, Inc. ("Telco"), the court finds that an injunction against Hakim should extend to certain actions by Morrissey and Telco based on their actions in active concert and participation with Hakim. Accordingly, plaintiffs' motion for preliminary injunction is granted in part. This entry states the court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52 and 65.

### Findings of Fact

1. Plaintiff Frontier Corporation is a New York corporation with its principal place of business in New York. Plaintiff Frontier Communication Services, Inc. is a Michigan corporation with its principal place of business in Michigan.

2. Defendant Telco Communications Group, Inc. ("Telco") is a Virginia corporation with its principal place of business in Indiana. Defendants David Morrissey and Kim Hakim are citizens of Indiana. Defendant Stephen Canton is a citizen of Virginia.

3. In 1995, defendants Morrissey, Hakim, and Canton were all employed by a company known as "Allnet," which was in the business of providing long distance telecommunications services. All three of these defendants signed employment contracts with Allnet that included non-competition covenants and terms dealing with confidential information. During 1995, Frontier acquired control of Allnet and became its successor in interest with respect to the individual defendants' employment contracts.

4. Defendant Canton left employment with Frontier in September 1995. In April 1996, Canton became the president of a new commercial sales division for Telco. The terms of Canton's employment agreement with Allnet/Frontier imposed obligations on him for one year following termination of his employment. Those obligations expired by

their terms on or about October 1, 1996, except that Canton remained obligated to preserve the confidentiality of any proprietary information of Frontier's to which he gained access as an employee of Allnet/Frontier.

5. Canton, Telco, and Frontier agreed to resolve certain disputes arising out of Canton's new job through two letter agreements executed in June 1996 and expiring by their terms on October 1, 1996. Def. Ex. A & B. Through those agreements, Telco and Canton agreed not to make "affirmative attempts to solicit Frontier employees." They also agreed to put in place certain procedures to ensure that any Frontier employees who joined Telco would not violate their obligations to Frontier.

6. Defendant Morrissey's employment contract with Allnet/Frontier included several provisions relevant here. Morrissey agreed that he would have access to confidential information related to Allnet's business, including customer information. He agreed not to make "any unauthorized use or disclosure during or subsequent to my employment with Allnet of the Confidential Information," and to return any confidential information that might come into his possession during his employment or thereafter. Morrissey's agreement also provided:

> During the course of my employment with Allnet and for a period of one year thereafter, I will not, directly or indirectly, or help others to (i) solicit the trade or patronage of any of the customers of Allnet in competition with Allnet, or (ii) solicit for employment any other employees of Allnet to leave their employment with Allnet in order to accept employment of any kind with any other person, firm, partnership, corporation or other entity.

Def. Ex. H, ¶ 4. Morrissey left Frontier's employ on April 11, 1996, and joined Telco on May 28, 1996, as its state director for Indiana. He has supervisory responsibility for all Telco employees in Indiana.

7. Defendant Hakim had a similar agreement with essentially identical terms concerning confidential information and nonsolicitation of Frontier customers and employees. See Def. Ex. G. Hakim worked as a sales representative for Allnet/Frontier in Dallas and St. Louis. In early 1996, she transferred to the Frontier sales office in Indianapolis because her husband was transferred to Indianapolis. She worked in Frontier's Indianapolis office for only a few weeks before going on maternity leave in late March 1996. While on maternity leave, Hakim did not continue to work for Frontier, but she continued to receive a percentage of her base salary. Hakim was due to return to Frontier from maternity leave on or about August 1, 1996. However, she instead tendered her resignation to Frontier on August 5, 1996, and began working as a sales representative for Telco in Indianapolis in early August 1996.

8. The evidence here shows that the market for providing long distance telecommunications services to small and medium size businesses is extremely competitive. Even for customers who spend as little as $100 to $500 per month on long distance services, a number of long distance companies are competing vigorously for their business. Sales depend on price and the quality of service, of course, but a sales representative's personal relationship and good will with a customer is often critical in determining a customer's choice of long distance carriers in this competitive market where it is so difficult to distinguish one "product" from another.

9. Both Frontier and Telco seek new business in this segment of the market by having their sales representatives make "cold calls" on potential customers at their places of business. At the risk of great understatement, cold calling is a difficult way to sell. A busy sales representative might make 500 to 1,000 cold calls in a month, and could succeed in this segment of the market by closing 10 to 20 sales in a month. To succeed with this cold call method of sales, a sales representative must be able to use time efficiently. Also, it is often helpful to be able to show in a cold call that the sales representative is already familiar with the customer and its needs. Accordingly, information about a customer is a valuable commodity in the business. Specifically, information as to the identity of the customer's decision maker for long distance services, the scale of the cus-

tomer's long distance use, and the special services and features used by the customer can help a sales representative save time and make a more favorable impression on the customer.

10. One additional feature of the market is especially important here. These long distance carriers often offer customers special price and service packages that depend on the customer's commitment to use the carrier's service for a specified term, usually 12, 18, or 24 months. The termination date of such a contract is an important piece of information for competitors seeking to take over the customer's business. As the termination date approaches, a customer is more likely to be receptive to talking with competitors and comparison-shopping. At other times, a sales representative is much more likely to be wasting his or her time with the customer.

11. Frontier maintains records of its customer information in records called "customer base runs." These records show on one page the key information about the customer: name, address, and telephone number, identity and telephone number of the decision maker, its volume of long distance usage (in dollars) for the last three months, other key information about Frontier's record of dealing with the customer, including the termination date of any special program the customer is on, a list of any special services and features the customer uses, "jeopardy conditions" showing any situations that might mean that Frontier's relationship with the customer is at risk, and the identity of Frontier's sales representative. Each customer record in the customer base run bears the legend in capital letters: "PROPRIETARY INFORMATION * * NOT FOR DUPLICATION UNDER ANY CIRCUMSTANCES * *." Def. Ex. Y.

12. Frontier takes reasonable steps to maintain the confidentiality of these customer base runs. Although all of the competitively useful information in the customer base runs is information that the customer is free to disclose to a competitor's sales representative, there is an important difference in value between, on the one hand, merely having the opportunity to call on many hundreds

of potential customers and to ask them for all this information about their businesses, and, on the other hand, having all this information at one's fingerprints in one thick computer printout. The compilation therefore has substantial value to Frontier and could be valuable to a competitor seeking to take away Frontier customers.

13. When Hakim cleared out her desk at Frontier, she took with her some customer base runs containing information about hundreds of Frontier customers. The base runs that she took amounted to about a two or three inch thick stack of computer printouts. They included records on the Frontier customers that Hakim had signed in the Dallas and St. Louis areas. They also included records on a large number of Frontier customers in the Indianapolis area. They did not include any Frontier customers that Hakim had signed in Indianapolis because, in the few weeks that she worked in Indianapolis before taking maternity leave, she did not sign any new customers for Frontier.

14. When Hakim began working for Telco in Indianapolis, she brought the Frontier base runs with her. She began using them immediately to solicit business for Telco from the customers included in the list. From the Indianapolis Telco office, Hakim persuaded several of "her" Frontier customers in Dallas and one of her St. Louis customers to switch to Telco during her first three months at Telco. She also used the customer base run records in soliciting business from Frontier customers in the Indianapolis area, including customers outside her assigned sales territories.

15. Because of her own compensation arrangement with Telco, Hakim stood to earn little or nothing in commissions from customers with relatively low long distance usage. Some of the Frontier customers whose records were in the customer base runs were those low-usage customers. Hakim gave selected pages from the base runs to other Telco sales representatives in the Indianapolis office for use as sales leads. She and these other representatives had an informal understanding to the effect that, if the lead turned into a Telco customer that produced a commission for the other sales representa-

tive, that person would pay Hakim $50 or $100 cash from the commission. Several of these leads turned into Telco customers, and the other sales representatives paid Hakim for the information that she had provided.

16. When she was negotiating with Telco for possible employment, Hakim signed a declaration to the effect that she knew Frontier's customer information would not be welcome at Telco. Def. Ex. L.

17. In August 1996, shortly after Hakim began working for Telco, Hakim told Morrissey that she had a list of Frontier customers and was using it to develop business for Telco. Morrissey knew that information was proprietary Frontier customer information. Prior to October 1996, Morrissey did not take any action to prevent her from using Frontier's information to compete against Frontier. Morrissey received daily information both orally and in writing about new customers signed up by Telco's Indianapolis sales representatives, including Hakim. The information he received showed as early as August 1996 that Hakim was selling to former Frontier customers. At that time, the written reports did not show customer addresses, but Morrissey knew that Hakim was closing deals with a few customers in Dallas and St. Louis, which were obviously far outside Hakim's assigned territory in the Indianapolis area.

18. During the week of September 16, 1996, both Morrissey and Hakim left voice mail messages with Darcy Andry, a "client service consultant" for Frontier in its Indianapolis office. At that time, Frontier was in the process of reducing the size of its staff in Indianapolis, and Andry had let Hakim know that she was interested in a new job. In their messages, both Morrissey and Hakim either more or less subtly invited Andry to contact them about a job with Telco. Andry gave the tapes of the messages to her supervisor at Frontier. The tapes were eventually transcribed and used in "cease and desist" letters to defendants. Shortly after Morrissey and Hakim left these messages with Andry, Andry left Frontier to join another long distance carrier.

19. On October 14, 1996, Frontier client service consultant Leo Buehler attended a meeting with CMH & Associates, a Frontier customer in New Castle, Indiana. Hakim, on behalf of Telco, was also present at the meeting. The customer had a contract committing it to use a certain level of service with Frontier, and Hakim had persuaded the customer to make a commitment to Telco. The customer could not reasonably use the "committed" levels of service with both carriers, and the meeting resulted in an arrangement by which the customer decided to divide its long distance use between the two companies at levels that would allow it to honor the Frontier contract, and Telco and Hakim agreed to reduce the level of commitment for use of Telco services.

20. On October 11, 1996, an attorney for Frontier wrote to Hakim and Morrissey. Those letters stated that Frontier had information that Hakim and Morrissey were soliciting "customers and agents" of Frontier in violation of their employment agreements and were improperly using confidential materials from their employment with Frontier. The letters warned Hakim and Morrissey of "dire consequences" and demanded that they "cease and desist" from soliciting Frontier customers and agents and from using proprietary Frontier information. Def. Exs. G & H. Copies of these letters were sent to the CEO of Telco, who directed them to Canton.

21. A few days later, after receiving these letters, Canton called the Indianapolis office of Telco to talk with Hakim and Morrissey. Both Hakim and Morrissey lied to Canton. Both denied that a customer list from Frontier was available to them and denied that they were using such a list. Canton made it clear to both that they should not have or use such information. After these phone calls, Morrissey told Hakim to "get rid" of the list. Hakim told other sales representatives to whom she had given parts of the list to get rid of the list and not to use it. However, the evidence before the court indicates that these efforts on Hakim's and Morrissey's parts were not overly vigorous, and that other sales representatives at Telco kept Frontier information that Hakim had given them and/or copied the key information before disposing of the actual pages from the Frontier list.

22. The evidence as to whether Telco sales representatives continued to use the Frontier customer information after October 1996 is not detailed. James Fessler, an apparently disinterested witness who left Telco several months ago, testified that he continued to use the customer information after Hakim had told him to stop. He also testified, however, that he never made a sale with the leads he received from Hakim. Kirk Givens, a former Telco sales representative with an obvious grudge against Telco, testified that he continued to use the customer information after being told in October not to use it, but he was quite vague about the timing and extent of that use. Another former Telco sales representative, Amy Gregory, testified that Hakim told her to return any copies of pages from the Frontier list but also to "copy down that information" because the list itself had to be burned. Tr. 242. Gregory also testified that she, Fessler, and Givens copied down that information.

23. Both Givens and Gregory testified that even after the Canton phone call to Hakim and Morrissey, the Telco sales manager in Indianapolis, Mike Burgett, had gone on a sales call in which they were using customer information from the Frontier list. Tr. 224, 245. However, Givens identified that customer as "Diamond Travel." Plaintiffs' Exhibit 7, which appears to be more reliable than Givens' and Gregory's memory, indicates that Givens made a sale to Diamond Travel in August 1996.

24. Based on the evidence now before the court, the court finds that after telling Canton in October 1996 that they were not using a Frontier customer list, when in fact Hakim and several other sales representatives had been using exactly such a list, Morrissey and Hakim made only modest gestures in the direction of preventing further use of the information. There is no evidence that Telco took any steps other than to have Hakim tell other sales representatives to destroy the pages from the list, and the court credits Gregory's testimony that Hakim told her to copy down information before destroying those pages. The court also finds that some use of the Frontier information continued after Hakim told the others to destroy or return the pages of the list. At this point, however, it appears that this continuing use of the list after October 1996 was on a small scale, and there is no evidence that it was particularly successful or caused substantial losses for Frontier.

25. On January 7, 1997, Terrance P. O'Grady, an attorney for Frontier, wrote to Bryan K. Rachlin, an attorney for Telco, asserting that Hakim and Morrissey were continuing to violate their obligations to Frontier. Def. Ex. O. O'Grady provided documentation of the Hakim and Morrissey solicitations of Darcy Andry. He also provided affidavits from two Frontier employees, Leo Buehler and Kristen Mentgen. The Buehler affidavit reported on the CMH & Associates meeting described above and summarized second- and third-hand circumstantial evidence that led Buehler to conclude that Morrissey and Hakim were using Frontier proprietary information. Most of the "evidence" contained in the Buehler affidavit is not admissible to prove the truth of the matters asserted, and the information presented did not lead *inevitably* to the conclusion that Morrissey and Hakim were using proprietary Frontier customer information. Nevertheless, the other evidence in the case shows that at least Hakim had been doing precisely that, and that Morrissey had known of Hakim's conduct, tolerated it, and accepted its benefits for Telco. In his letter, O'Grady demanded that Telco immediately terminate both Morrissey and Hakim. In a letter dated February 27, 1997, Rachlin responded to O'Grady's letter and a later phone call. Def. Ex. P. Rachlin told O'Grady that Telco had investigated the information and had decided not to terminate Morrissey, but to insist that Morrissey make a "sizable cash contribution to charity" as a disciplinary measure and to warn Morrissey that additional facts could lead to termination. Morrissey has not yet made the contribution.

26. Frontier filed this action on March 14, 1997, and obtained service of process on defendants within a few days. On about March 24, 1997, Kirk Givens called Canton about sales commissions he claimed Telco owed him after his departure from Telco. In the course of that call, Givens told Canton that

the Indianapolis Telco office had been using a proprietary customer list from Frontier, and Givens threatened to give that information to Frontier. It is not clear just how explicit the threat was, but Canton reasonably understood Givens to have been threatening to contact Frontier and tell what he knew about use of Frontier information if Telco did not pay him the sales commissions he claimed. Canton did not give in to the threat, but he visited the Indianapolis office a day or two later. He spoke with both Morrissey and Hakim. Both admitted that, contrary to what they had told Canton in October 1996, a Frontier list had been used in the Indianapolis office, although both asserted that it had not been used for months. Hakim told Canton that she still had a small portion of the Frontier list in her attic at home, and she went home and gave that to Canton. (Those materials are now in evidence as Def. Ex. Y, which is under seal.)

## Conclusions of Law

1. The court has jurisdiction over the subject matter and over defendants Telco, Hakim, and Morrissey. Because plaintiffs withdrew their request for preliminary injunctive relief against defendant Canton personally, the court need not decide at this time whether it has jurisdiction over him.

■■■ 2. To obtain a preliminary injunction, a party must first show a reasonable likelihood of success on the merits of its claims and a sufficiently imminent threat of irreparable harm to it if no injunction is issued. (Harm may be irreparable if a later award of damages would not be an adequate remedy for the wrong.) If the moving party meets these two criteria, the court must then balance the harms of erroneously granting or erroneously denying injunctive relief, and must consider the public interest, including the effects an injunction or the absence of an injunction would have on the interests of persons not before the court. See, *e.g.*, *Advent Elecs., Inc. v. Buckman*, 112 F.3d 267, 274 (7th Cir.1997); *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1267 (7th Cir.1995).

## I. Likelihood of Success on the Merits

3. Plaintiffs' motion for preliminary injunction seeks relief based on: Count I against Morrissey and Hakim for breach of contract by soliciting Frontier employees and by misappropriating confidential information; Count IV against Morrissey, Hakim, and Telco for tortious interference with Frontier's contractual relations with its other employees and with customers; and Count V against Morrissey, Hakim, and Telco for tortious interference with Frontier's prospective economic relationships with its customers.[1]

■■■ 4. Counts IV and V can be dealt with briefly for purposes of the preliminary injunction. With respect to Count IV, Frontier must show that defendants induced Frontier's customers or employees to breach a contract with Frontier. See *Mahrle v. Danke*, 216 Mich.App. 343, 549 N.W.2d 56, 60 (1996); accord, *Keith v. Mendus*, 661 N.E.2d 26, 36 (Ind.App.1996). Frontier has made no such showing.[2] With respect to Count V, it is not necessary to show that a customer was

---

1. At this time the court is not considering any of the claims against Canton personally or Count III, the claim for breach of contract against Telco, because the contract at issue in Count III expired by its own terms on October 1, 1996.

2. Because Frontier has not offered evidence that any customers' or employees' contracts were breached as a result of defendants' acts, the court need not decide whether defendants acted tortiously. See *Jim–Bob, Inc. v. Mehling*, 178 Mich.App. 71, 443 N.W.2d 451, 462 (1989) (defendants must induce breach by "the intentional doing of a *per se* wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another"). Of course, the mere solicitation of customers and employees of a competitor is not tortious. The question

under Michigan law would appear to be whether, even in the absence of contract, a former employee has a duty not to use or disclose confidential customer information of the former employer. The Michigan Supreme Court has indicated that such a common law duty exists, see *Follmer, Rudzewicz & Co. v. Kosco*, 420 Mich. 394, 362 N.W.2d 676, 681 (1984) ("Even in the absence of a contract, an employee has a duty not to use or disclose confidential information acquired in the course of his employment."), but the court has not been crystal clear on this point. See *Hayes–Albion v. Kuberski*, 421 Mich. 170, 364 N.W.2d 609, 615 (1984) (interpreting *Kosco*, decided on the same day, as recognizing that information about customers' needs "is not a trade secret at common law").

induced to breach a contract. However, plaintiffs have not pursued this theory in their brief or proposed findings of fact and conclusions of law. Plaintiffs have not met their burden of showing a reasonable likelihood of prevailing on Counts IV or V.

5. The heart of plaintiffs' case for a preliminary injunction is Count I, alleging breaches of contracts with plaintiffs. Under Count I, plaintiffs seek injunctive relief with respect to three different types of conduct: defendants' solicitation of Frontier customers; their solicitation of Frontier employees; and their misuse of confidential information about Frontier customers. The court considers the likelihood of success on each of these claims in turn.

### A. Solicitation of Frontier Customers

6. Telco itself is under no contractual obligation not to solicit the business of Frontier customers, and any such agreement would of course present grave difficulties under the Sherman Act. Defendant Morrissey's own employment contract with Frontier included a one-year prohibition on solicitation of Frontier customers, but that term expired on April 11, 1997. No injunctive relief against Morrissey on that score would be appropriate now.

7. Hakim's contract also imposes a one-year prohibition on solicitation of Frontier customers. Relying on the general principle that restrictive covenants should be construed narrowly, Hakim argues that the one-year prohibition has expired because it should be calculated from the time she went on maternity leave in late March 1996 rather than from her resignation on August 5, 1996. Hakim continued to receive compensation from Frontier throughout her maternity leave, albeit at a reduced rate. In addition, she continued to have at least some access to confidential Frontier information until the date of her resignation. The Frontier lists that Hakim took with her when she resigned included computer run dates of April 11, 1996, April 22, 1996, and June 8, 1996, all dates after her maternity leave began. See Def. Ex. Y. The operative language in the covenant is during "the course of my employment with Allnet and for a period of one year

thereafter...." The course of Hakim's employment with Allnet and Frontier extended for purposes of that covenant through August 5, 1996. Therefore, the covenant is still in effect.

8. Hakim also contends that the scope of the contractual prohibition on soliciting Frontier customers is unreasonable and unenforceable. The court agrees that it is unreasonably broad and concludes that the covenant is enforceable only as to customers that Hakim herself had successfully solicited on behalf of Frontier. Michigan law governs Hakim's contract with Frontier. Michigan law requires that an employee's covenant not to compete after termination of employment be "reasonable as to its duration, geographical area, and the type of employment or line of business." Mich. Comp. Laws Ann. § 445.774a(1). The one-year duration is reasonable here, and the contract does not unduly restrict Hakim's employment or line of business, even for that one-year period.

9. The issue here concerns the "geographical" scope. The covenant contains no express geographic limit. By its terms the covenant would prohibit Hakim from calling on Frontier customers coast to coast, regardless of whether she had ever had any contacts with those customers while working for Frontier. This restriction is too broad.

10. A covenant is enforceable "only to the extent reasonably necessary to protect the employer's reasonable competitive business interests." *Robert Half Int'l, Inc. v. Van Steenis*, 784 F.Supp. 1263, 1273 (E.D.Mich.1991), citing Mich. Comp. Laws Ann. § 445.774a(1). An employer has a reasonable business interest in protecting its good will and, specifically, in "restricting its former employees from enticing away the employer's old customers." *Smart Corp. v. Grider*, 650 N.E.2d 80, 83 (Ind.App.1995); accord, *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Grall*, 836 F.Supp. 428, 433–34 (W.D.Mich.1993) (applying Michigan law). A covenant restricting an ex-employee from soliciting some of the former employer's customers can be valid even absent an express geographical limit, especially where, as is the case here, the employer's legitimate interests

arise from the good will the sales representative established with the customers on behalf of that employer. See *Grall*, 836 F.Supp. at 434 (agreement prohibiting ex-employee stockbroker from soliciting customers he serviced while with employer was reasonable because it lasted one year, did not prevent him from working as a stockbroker, and did "not contain a geographical restriction" on his ability to work); cf. *American Express Fin. Advisors, Inc. v. Scott*, 955 F.Supp. 688, 692 (N.D.Tex.1996) (covenant lacking express geographical limitation enforceable because it made clear it limited ex-employee from contacting only customers he served while working for employer); *Boisen v. Petersen Flying Serv., Inc.*, 222 Neb. 239, 383 N.W.2d 29, 33 (1986) ("Where an employee has substantial personal contact with the employer's customers, develops goodwill with such customers, and siphons away the goodwill under circumstances where the goodwill properly belongs to the employer, ... the employer has a legitimate need for protection against the employee's competition.").

11. In this case the customer limitation is not reasonable and does not serve "an employer's reasonable competitive business interests" to the extent that it applies to customers with whom Hakim had no contact while at Frontier. See *Hahn v. Drees, Perugini & Co.* 581 N.E.2d 457, 461 (Ind.App. 1991) (reasonableness of restraining an ex-employee from serving a client of ex-employer with whom ex-employee had no contact is "highly questionable"), quoting *Seach v. Richards, Dieterle & Co.*, 439 N.E.2d 208, 213–14 (Ind.App.1982). In addition, if Hakim is "cold calling" prospective customers (and if she is no longer using the confidential customer information she took from Frontier), she has no way of knowing whether the customer whose door she is knocking on is a Frontier customer. If she is able to sell Telco's services to that customer without using either the good will or confidential information that belongs to Frontier, she should be permitted to do so.

12. The overbreadth does not mean the Frontier covenant is entirely unenforceable. Michigan law provides instructions in such cases: "To the extent any such agreement or covenant is found to be unreasonable in any respect, a court may limit the agreement to render it reasonable in light of the circumstances in which it was made and specifically enforce the agreement as limited." Mich. Comp. Laws Ann. § 445.774a(1). In some contexts, a "customer" prohibition could reasonably be applied to prospective customers with whom the sales representative had been trying to develop a business relationship. However, such a broad interpretation of "customer" would not be reasonable in this line of work, where sales are based on cold calling and where individual customers generate relatively modest revenues. Accordingly, the court concludes that Hakim's covenant remains enforceable through August 5, 1997, as to the customers of Frontier for which she was the sales representative. Hakim has admitted that she solicited a number of such customers and was successful in some cases. Plaintiffs have shown a reasonable likelihood of prevailing on the merits of their claim that Hakim breached the terms of her covenant not to solicit Frontier customers for one year after leaving employment with Frontier.

**B. Solicitation of Frontier Employees**

13. The evidence here shows that both Morrissey and Hakim solicited Darcy Andry to leave Frontier and join Telco. That effort was a violation of their contractual covenants not to solicit Frontier employees for one year after their departure. At this point, however, the situation can be described as "no harm, no foul." Andry was already planning to leave Frontier, and she did not go to Telco. The court has before it no evidence of other improper attempts by these defendants to solicit other Frontier employees to join Telco.

**C. Misuse of Proprietary Information**

14. Frontier's customer base runs qualify as "confidential information" under Hakim's and Morrissey's employment contracts with Frontier. See *Follmer, Rudzewicz & Co. v. Kosco*, 420 Mich. 394, 362 N.W.2d 676, 680–81 (1984). There is no doubt that Hakim violated her contract with Frontier first by taking copies of the base

runs when she left, then by using some of the information herself, and finally by giving some of the information to other Telco sales representatives with the understanding that if they used it successfully, they would share their commissions with her. Frontier has shown an overwhelming likelihood of prevailing on the merits of these claims against Hakim.[3]

15. Frontier's contract claim against Morrissey for breach of his contract with respect to confidential information is a little more complicated. There is no evidence that Morrissey took any confidential Frontier information with him when he left. The evidence shows that the only confidential Frontier information that came within Morrissey's scope of authority with Telco was the information that Hakim stole from Frontier. Plaintiffs seem to contend that Morrissey's failure to return that information to plaintiffs and his failure to stop Hakim from using it were violations of his own contract with them. The court does not agree. Morrissey is contractually obligated for the indefinite future not to make "unauthorized use or disclosure ... of the Confidential Information" and "to deliver to [Frontier] promptly upon request and on the date of termination of my employment all documents, copies thereof and other materials in my possession or, which thereafter come into my possession, pertaining to the business of [Frontier], including but not limited to Confidential Information." The contractual obligation must be understood as limited to information to which Morrissey actually gained access while employed with plaintiffs or directly as a result of that employment. Otherwise, the broad obligation to "deliver" to Frontier "all documents ... which thereafter come into my possession, pertaining to the business of [Frontier]" would extend to internal Telco documents that discuss competitors, for such documents would surely "pertain" to the business of Frontier. As for information to

which he gained access at some later time, Morrissey should be treated by the law the same as any manager of any competitor. Accordingly, plaintiffs have not shown a reasonable likelihood of prevailing on their claim that Morrissey breached his own contractual obligations with respect to Confidential customer information. As discussed below, however, the court finds that a preliminary injunction should apply to Morrissey and Telco to the extent of their actions "in active concert or participation" with Hakim. See Fed.R.Civ.P. 65(d).

## II. Irreparable Harm, Balance of Harms, and Public Interest

16. Thus, Frontier has shown an overwhelming likelihood of prevailing on the merits of its claims against Hakim for breach of her contract with Frontier by soliciting her former customers and by stealing and misusing Frontier's confidential information. The more difficult issues in this case concern the extent and imminence of any threats of irreparable harm at this time, and thus the need for any injunctive relief. Hakim was violating her contract by soliciting her Frontier customers and by misusing confidential information from August to October 1996. To the extent that customers have already been lost by misuse of confidential information, Michigan law authorizes only a damages remedy, not an injunction that would force the customer to change suppliers. *Hayes–Albion v. Kuberski*, 421 Mich. 170, 364 N.W.2d 609, 615 (1984); *Kosco*, 362 N.W.2d at 683–84. However, Michigan law authorizes injunctive relief to prevent future violations. *E.g.*, *Grall*, 836 F.Supp. at 433.

17. Defendants contend that no injunctive relief is warranted here because any violations occurred at least six months ago and there is no imminent threat of continued wrongdoing. They rely on a line of cases

---

**3.** There remain significant questions, however, about the extent to which Frontier sustained actual losses of customers and business. The existing record shows that Hakim was able to switch some of her Dallas customers and one St. Louis customer to Telco. In addition, she and other Telco representatives in Indianapolis were able to make some successful use of the Frontier

information to win a few customers in Indianapolis. In view of Telco's practice of cold-calling on a large number of prospective customers, it does not seem reasonable to conclude that *all* customers who switched from Frontier to Telco in the Indianapolis area after August 5, 1996, did so because of misappropriation and misuse of confidential information.

explaining that federal courts issue preliminary injunctions only to prevent imminent and substantial threats of wrongdoing, and that injunctions should be denied if a defendant is no longer engaged in the wrongful conduct and is unlikely to repeat that conduct. See *Ragsdale v. Turnock*, 841 F.2d 1358, 1366 (7th Cir.1988); *Roper Corp. v. Litton Sys., Inc.*, 757 F.2d 1266, 1270–71 (Fed.Cir.1985); *Schutt Mfg. Co. v. Riddell, Inc.*, 673 F.2d 202, 207 (7th Cir.1982); *Kennedy v. Kennedy*, 616 N.E.2d 39, 42 (Ind. App.1993). Plaintiffs counter with *United States v. Oregon State Med. Soc'y*, 343 U.S. 326, 333, 72 S.Ct. 690, 695–96, 96 L.Ed. 978 (1952), and *Wilk v. American Med. Ass'n*, 895 F.2d 352, 367 (7th Cir.1990), which instruct courts to require "clear proof" that a wrongful practice has been abandoned, and to guard against attempts to avoid injunctions "by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is a probability of resumption."

18. In this case the balance weighs in favor of injunctive relief. Hakim's violation of her contractual obligations was not a brief, aberrant episode. Her actions were systematic and continued at least for nearly three months. When Canton called her and made it clear that she should not be using Frontier's confidential information, Hakim lied to Canton and took only relatively ineffective measures to prevent future misuse of the information. She also kept some of the confidential list at home. The cease and desist letter she received from Frontier prompted no response and no actions to ensure her compliance with her contractual obligations. In addition, when plaintiffs were trying to serve subpoenas on Hakim and Morrissey to compel them to attend the preliminary injunction hearing in this action, both actively attempted to evade service.[4] Against this background, the court concludes that a preliminary injunction, backed up with the court's contempt powers, is warranted here against Hakim. Perhaps her protests of reform and repentance are sincere, but the court is not so confident of that as to deny injunctive relief on the strength of Hakim's promises of future good behavior.

19. The court also concludes that some of the injunctive relief against Hakim should apply to Morrissey and Telco as well. For these purposes, the court does not distinguish between Telco and Morrissey, for Morrissey has been the senior Telco manager in Indiana at all relevant times. Telco cannot avoid accountability for Morrissey's actions on the theory that he was a relatively low-level employee.[5] The issue is whether Morrissey's actions and inactions warrant injunctive relief here. The evidence now before the court does not show that defendant Morrissey actually participated in misuse of the Frontier information that Hakim stole. That is, there is no credible evidence that he was personally using the information to call on prospective customers. However, the evidence shows that Morrissey knew that Hakim had taken proprietary Frontier information, was using it herself for Telco's benefit, and was distributing it to other Telco representatives he supervised to use for Telco's benefit. Before the mid-October phone call from Canton, Morrissey took no actions of any kind to stop the misuse of Frontier's information by Hakim or the other sales representatives under his supervision. Then he actively lied to Canton to cover up the prior use of the confidential information and failed to take effective steps to ensure that the misuse of the information would stop. The evidence also indicates that Morrissey both tolerated and encouraged Hakim's solic-

4. The hearing transcript from the morning of April 24, 1997, shows these efforts. After the court informed Hakim's and Morrissey's counsel that United States Marshals would be directed to serve subpoenas on them if necessary, Hakim and Morrissey appeared in court within an hour.

5. The question of whether Telco and Morrissey might be held liable in damages arising from Hakim's activities depends on the resolution of issues not yet briefed by the parties. The Michigan Supreme Court has not been completely clear on this issue. Compare *Kosco*, 362 N.W.2d at 681 ("Even in the absence of a contract, an employee has a duty not to use or disclose confidential information acquired in the course of his employment."), with *Hayes–Albion*, 364 N.W.2d at 615 (interpreting *Kosco* as recognizing that information about clients' needs "is not a trade secret at common law"). The court leaves to another, less urgent time, the resolution of these questions.

itation of her former customers in Dallas and St. Louis. There is no evidence that Morrissey took any steps to prevent further violations. He also attempted to evade service of a subpoena during the hearing. Finally, because injunctive relief is warranted with respect to Hakim's continued contact with her Dallas and St. Louis customers, including some who switched to Telco, the injunction must contain provisions concerning Telco's conduct with respect to those customers.

20. Under these circumstances, plaintiffs have shown the first two elements needed for preliminary injunctive relief focused on Hakim's violations of her contract with Frontier. The court will set forth below the scope of that injunctive relief below. Such limited relief will not impose on any defendant a burden so significant as to outweigh plaintiffs' need for injunctive relief. In addition, the injunctive relief, which must be limited pursuant to Michigan law, adequately protects the interests of the public (and especially the two competitors' customers). Accordingly, all four of the canonical preliminary injunction factors point in favor of limited injunctive relief here.

### III. The Scope of Injunctive Relief

First, Hakim will be enjoined from any further solicitation of her prior customers in Dallas and St. Louis through August 5, 1997. Hakim will also be enjoined through August 5, 1997, from continuing to deal personally with her prior Dallas and St. Louis customers that she was able to switch to Telco, and from providing any direct or indirect assistance to other Telco representatives who deal with those customers. Telco will be ordered to reassign responsibility for those customers immediately, and to someone outside the Indianapolis Telco office. If Hakim is called by any of these customers, she must refer the call to another Telco person. If she gives *any* explanation to the customer, she must tell the customer *only* the following: "The federal court in Indianapolis has ordered me not to talk or communicate with you because I violated a covenant not to compete with Frontier. That court order is effective through August 5, 1997."

The court will also order Hakim, Morrissey, and Telco to return to Frontier within ten days all confidential information that both concerns Frontier or its customers and that was obtained from Frontier by Hakim. This order will apply to all base runs and any documents (including copies) that contain any information taken from Hakim's list.

The court will also order Hakim, Morrissey, and Telco not to make any further use of such confidential information taken by Hakim from Frontier.

The court will order Hakim, Morrissey, and Telco to disclose within ten days their best knowledge and/or information concerning the location and identity of any documents outside their control and custody containing any of Frontier's confidential information taken by Hakim.

The preliminary injunction shall be effective immediately. As a condition of its effectiveness, however, plaintiffs shall file with the court no later than May 16, 1997, security in favor of defendants in the amount of $10,000 for the payment of any costs or damages that defendants may suffer by reason of having been wrongfully enjoined.

A separate injunction shall issue. Many issues relating to damages claims remain open, of course. By separate order, the court will set an initial pretrial conference to develop a case management plan to deal with those remaining claims.