*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

DARSHAN SINGH GREWAL, Individually and as Trustee of the DARSHAN S. GREWAL REVOCABLE TRUST and as Next Friend of JASDEEP SINGH GREWAL, a minor, PARGAT SINGH GREWAL, Individually and as Trustee of the PARGAT S. GREWAL REVOCABLE TRUST, and as next friend of ANVEET GREWAL KAUR GREWAL and JASLEEN KAUR GREWAL, minors, BALWINDER SINGH GREWAL, AJMER SINGH GREWAL, BEVNEET KAUR GREWAL, JASMEET SINGH GREWAL, DSG FAMILY LIMITED PARTNERSHIP, DSG FAMILY LLC, MSG FAMILY LLC, MSG FAMILY LIMITED PARTNERSHIP, PDAB GROUP LLC, PSG FAMILY LIMITED PARTNERSHIP, PSG FAMILY LLC, PSG II FAMILY LLC, PSG II FAMILY LIMITED PARTNERSHIP,

       Plaintiffs-Appellees,

v

GURMALE SINGH GREWAL, Individually and as Trustee of the GURMALE S. GREWAL REVOCABLE TRUST, LUSHMAN SINGH GREWAL, Individually and as Trustee of the LUSHMAN S. GREWAL REVOCABLE TRUST, JEAT SINGH GREWAL, Individually and as Trustee of the JEAT S. GREWAL REVOCABLE TRUST, CARL SLEMMER, LAWRENCE A. KILGORE, SARWAN SINGH GREWAL II, Individually and as Trustee of the SARWAN S. GREWAL II REVOCABLE TRUST, SUNDEEP SINGH GREWAL, Individually and as Trustee of the SUNDEEP S. GREWAL REVOCABLE TRUST, PULVINDER KAUR GREWAL,

UNPUBLISHED
January 22, 2019

No.  341079
Oakland Circuit Court
LC No.  2013-137587-CB

Individually and as Trustee of the PULVINDER K. GREWAL REVOCABLE TRUST, KULVINDER K. GREWAL, Individually and as Trustee of the KULVINDER K. GREWAL REVOCABLE TRUST, MANDEEP KAUR MALHOTRA, Individually and as Trustee of the MANDEEP K. GREWAL REVOCABLE TRUST, AJITPAL SINGH GREWAL, Individually and as Trustee of the AJITPAL S. GREWAL REVOCABLE TRUST, RAJINDERPAL SINGH GREWAL, Individually and as Trustee of the RAJINDERPAL SINGH GREWAL REVOCABLE TRUST, AVTAR SINGH GREWAL, Individually and as Trustee of the AVTAR S. GREWAL REVOCABLE TRUST, AMARDEEP S. GREWAL, Individually and as Trustee of the AMARDEEP S. GREWAL REVOCABLE TRUST, REENA K. GREWAL, Individually and as Trustee of the REENA K. GREWAL REVOCABLE TRUST, JOHN DOE SHAREHOLDERS, MEMBERS, TRUSTS AND PARTNERSHIPS, GSG GROUP LLC, GLJ DEVELOPMENT LLC, LSG GROUP LLC, SGC ASSOCIATES, INC., GSG FAMILY LIMITED PARTNERSHIP, LSG FAMILY LIMITED PARTNERSHIP, JSG II FAMILY LIMITED PARTNERSHIP, JSG FAMILY LIMITED PARTNERSHIP, JSG GROUP LLC, JOHN DOE FAMILY LIMITED OR OTHER PARTNERSHIPS, 300 PARK LLC, ADAMS CREEK APARTMENTS LLC, ARBORS APARTMENTS LLC, BOLINGBROKE SINGH LLC, BRANDYWYNE SINGH LLC, BRIARCLIFF APARTMENTS LLC, BROWNSTONES APARTMENTS LLC, BROWNSTONES IN NOVI LLC, CADYCENTRE OFFICE & SHOPS LLC, CHARING CROSS SINGH LLC, CHARLESTON PARK SINGH LLC, CP DEVELOPMENT LLC, CP DEVELOPMENT II LLC, DRAKE POINT OFFICE CENTER LLC, DLT ASSET MANAGEMENT LLC, E & L 200, INC., FRANKLIN OFFICE CENTER LLC, FRANKLIN OFFICE CENTER II LLC, GREWAL FAMILY V LLC, LEGACY PARC SINGH LLC, LINKS OF NOVI SINGH LLC, MAINCENTRE APARTMENTS LIMITED PARTNERSHIP, MAINDYWINE CREEK II LLC, MAINDYWINE

GENERAL CORPORATION, MAINSTREET VILLAGE I LLC, MAINSTREET VILLAGE II LLC, MATRIX PROPERTIES LLC, MSG HOLDING LLC, NORTH LANE ASSOCIATES LLC, NORTHRIDGE APARTMENTS I & II LLC, NORTHRIDGE APARTMENTS II, LTD., NORTHRIDGE APARTMENTS III LIMITED PARTNERSHIP, NORTHRIDGE APARTMENTS, LTD., OAKLAND HELPING HAND LLC, OAKLAND HOME CARE LLC, OAKLAND HOME CARE NC LLC, PEH HOLDING LLC, RAWR PROPERTIES LLC, SAXONBURY SINGH LLC, SGC ASSOCIATES, INC., SHOREBROOKE TOWNHOMES LLC, SINGH 1631 LLC, SINGH I LLC, SINGH II LLC, SINGH III LLC, SINGH 3 ½ LLC, SINGH IV LLC, SINGH V LLC, SINGH VI LLC, SINGH VII LLC, SINGH IX LLC, SINGH ACCOUNTING SERVICES LLC, SINGH ASSOCIATES LLC, SINGH-BRADBY LLC, SINGH CAPITAL COMPANY, SINGH CAPITAL LLC, SINGH CONSTRUCTION COMPANY, SINGH CONSTRUCTION II LLC, SINGH DEVELOPMENT LLC, SINGH EQUITY CORPORATION, SINGH EXECUTIVE PARK LLC, SINGH EXECUTIVE PARK 2 LLC, SINGH DEVELOPMENT LLC, SINGH GENERAL CORPORATION, SINGH GLJ SUGAL, SINGH FINANCIAL COMPANY, SINGH HOMES, INC., SINGH HOMES LLC, SINGH HOMES II LLC, SINGH HOMES 2 LLC, SINGH HOMES BUILDING COMPANY LLC, SINGH HOMES LIMITED PARTNERSHIP, SINGH HOMES REALTY LLC, SINGH HOMES CHARING CROSS LLC, SINGH HOMES CHARLESTON PARK LLC, SINGH HOMES FOX GLENN LLC, SINGH HOMES WHISPERING RIDGE LLC, SINGH LAND COMPANY, SINGH OF CHURCHILL CROSSING LLC, SINGH OF CHURCHILL CROSSING II LLC, SINGH CIDER MILL VILLAGE LLC, SINGH HOMES CHURCHILL CROSSING LLC, SINGH HOMES COPPERWOOD LLC, SINGH HILLS OF LOON LAKE LLC, SINGH LOON LAKE WOODLANDS LLC, SINGH HOMES TERRA COVE LLC, SINGH HOMES TOLLGATE

WOODS II LLC, SINGH HOMES WESTCHESTER LLC, SINGH HOMES WILLOWBROOK LLC, SINGH HOMES WILLOWBROOK IV LLC, SINGH INDUSTRIAL PROPERTIES LLC, SINGH INVESTMENTS LLC, SINGH LAND COMPANY, SINGH OF MAINSTREET LLC, SINGH MAINSTREET VILLAGE II LLC, SINGH MANAGEMENT COMPANY, INC., SINGH MANAGEMENT COMPANY LLC, SINGH OBERLIN LLC, SINGH OF NORTH OAKS LLC, SINGH OFFICE CENTRE LLC, SINGH OFFICE CENTRE II LLC, SINGH OFFICE NC LLC, SINGH PROPERTIES COMPANY, SINGH PROPERTIES LLC, SINGH PROPERTIES II LLC, SINGH REALTY LLC, SUMMIT CREEK APARTMENTS I LLC, SINGH OF TOLLGATE RAVINES LLC, SINGH OF TOLLGATE WOODS LLC, SINGH STAFFING LLC, SIPAHI PROPERTIES LLC, SLD FINANCE LLC, SLD II FINANCE LLC, SWC STAFFING LLC, SWOC LLC, TOLLGATE WOODS SINGH II LLC, TOLLGATE RAVINES HOMES LLC, TOLLGATE WOODS III LLC, TOTTENHAM WOODS SINGH LLC, TURNBURY PARK LLC, TURNBURY PARK II LLC, WALTONWOOD ASHBURN LLC, WALTONWOOD MANAGEMENT LLC, , WALTONWOOD AT CARY II LLC, WALTONWOOD AT CARRIAGE PARK I LLC, WALTONWOOD AT CARRIAGE PARK II LLC, WALTONWOOD AT CHERRY HILL LLC, WALTONWOOD AT CHERRY HILL II LLC, WALTONWOOD AT COTSWORTH LLC, WALTONWOOD AT LAKESIDE I LLC, WALTONWOOD AT LAKESIDE II LLC, WALTONWOOD AT MAIN LLC, WALTONWOOD AT PROVIDENCE LLC, WALTONWOOD AT ROYAL OAK LLC, WALTONWOOD AT TWELVE OAKS I LLC, WALTONWOOD AT TWELVE OAKS II LLC, WALTONWOOD AT UNIVERSITY I LLC, WALTONWOOD II LIMITED DIVIDEND HOUSING ASSOCIATION LIMITED PARTNERSHIP, WESTBURY SHOPS LLC, WESTBURY APARTMENTS LLC, WESTBURY GENERAL CORPORATION, WESTCHESTER SINGH LLC, WESTCHESTER SINGH II LLC,

WEXFORD TOWNHOMES LLC, SINGH OF
WILLOWBROOK LIMITED PARTNERSHIP,
SINGH OF WILLOWBROOK II LLC, SINGH OF
WILLOWBROOK III LLC, SINGH OF
WILLOWBROOK IV LLC, WYNDCHASE
TOWNHOMES I LLC, WYNDCHASE PHASE II
LLC, WYNDCHASE PHASE III LLC, WS
FINANCE LLC, SINGH CONSTRUCTION NC
LLC, SINGH DEVELOPMENT, NC, SINGH
SENIOR LIVING NC LLC, SINGH SENIOR
LIVING II LLC WALTONWOOD AT CARY
LLC,

        Defendants-Appellants,

and

KENNETH CLARKSON,

        Defendant.

_____

Before:  K. F. KELLY, P.J., and RIORDAN and Tukel, JJ.

PER CURIAM.

Defendants appeal by right a judgment confirming the arbitrator's award of exemplary damages in favor of plaintiffs in the amount of $4,969,463.94 and correcting the arbitrator's award by striking the portion that ordered plaintiffs to provide an accounting of assets in India. We affirm.

## I.  BASIC FACTS AND PROCEDURAL HISTORY

This appeal arises from a multimillion dollar dispute that has arisen among members of the Grewal family with respect to the family business, known throughout these proceedings as the Singh family enterprise.  Plaintiffs include Pargat S. Grewal and Darshan S. Grewal, along with other parties, including Pargat and Darshan's brothers, Ajmer and Balvinder, Pargat and Darshan's minor children and a variety of business entities and trusts in which these individuals hold an interest.  The named defendants are comprised of Singh business entities in which plaintiffs allege they have an interest and are owed compensation as a result.  Plaintiffs have also named to this action Gurmale S. Grewal, Lushman S. Grewal and Jeat S. Grewal, along with the in-house counsel for the Singh family business, Lawrence Kilgore, and its accountant/controller, Carl Slemmer.  When this case proceeded to arbitration by agreement of the parties, plaintiffs sought an award from the arbitrator in excess of $561 million, which included alleged treble damages.  While asserting that plaintiffs' claims did not have legal merit, defendants did

acknowledge that plaintiffs had an interest in 31 Singh business entities to which they were entitled to receive compensation.

In its extensive written opinion and award, the arbitrator detailed the history of the Grewal family as it pertains to this dispute involving the Singh family enterprise.

> The genesis of the Singh Family Business is unique and very personal to the Parties. A significant amount of time was spent during the [arbitration] hearing describing the manner in which the business in the United States was started and how Gurmale, Lushman and Jeat [Grewal] immigrated to the United States, followed years later by Pargat and Darshan [Grewal], to build what has become a well[-]respected name in real estate and business in the Detroit area. The unique manner in which the business was started and the business philosophies employed from the beginning bears mentioning as this philosophy was an obvious influence on all of the parties' actions over the course of decades.

> In 1922, Sarwan Grewal immigrated to the United States. Sarwan was the uncle of Malkait (Darshan and Pargat's father) and Defendants Gurmale, Lushman and Jeat, as well as others within the family. In the early 1960s, Sarwan brought Gurmale, Lushman and Jeat as well as their cousin Tahil to the United States and essentially adopted them as his own. Gurmale was approximately 13 years at the time of his arrival in the U.S. with Lushman and Jeat only a few years older than him.

> When Sarwan passed away in 1968, due to the circumstances at the time, Gurmale left college and began to take over the operations of the business that his Uncle Sarwan had begun. Sarwan had no children of his own. Accordingly, he left his estate to his family members, which included individuals in India. In the early 1970s, the first "Singh" organization was formed[,] with the six nephews of Sarwan Grewal receiving an equal share. This included among them, Gurmale, Lushman, Jeat, Malkait, Tahil, and Ranjit. This was the beginning of the Singh enterprise.

> The business was operated on the principles of the Sikh faith. This included an understanding that everyone worked hard and contributed to the family or Clan's success and that this would create prosperity and success for the entire Clan, the rewards of which could then be enjoyed by everyone. The Clan concept of business and family operations was described at various times during the [arbitration] hearing. There was much discussion regarding the different generations within the Clan and as to which parties were considered "Gen I" (Generation I or the original) members of the Clan and those that were considered "Gen II" (or the offspring of the original members) of the Clan. While from a legal perspective such distinctions may not matter, within the circumstances and context of this case, it is an important part of understanding the manner in which the Singh family business was operated.

The concept involves a hierarchy based on generational considerations and involves collective effort by those in the Grewal Clan to contribute toward building the Clan's wealth. Accordingly, Gurmale, Lushman, Jeat, Malkait, Tahil and Ranjit considered themselves at the top of the hierarchy being the oldest generation ("Gen I") and unanimously appointed Gurmale as the leader. The idea was that the Clan leader, upon consulting with other older generation members, outlines the responsibilities, obligations and directed all of those within the Clan but always with the goal in mind of growing the Clan's wealth so everyone could prosper. The idea was for the older generation ("Gen I") to contribute to the Clan throughout their life, groom the next generation ("Gen II") to participate in the Clan's business operations and for that next generation ("Gen II") to eventually take over the operations, thereby permitting the older members of "Gen I" to retire and enjoy the fruits of their life's efforts while ensuring that the family business remains just that, owned by those within the family or Clan.

In order to implement the Clan business model, which included the desires of Gurmale, Lushman and Jeat to share the wealth of their hard work with their Clan, both in the U.S. and in India, it was established that Gurmale and/or Lushman and Jeat would be granted broad powers of attorney authority from the various Clan family members so that the assignment of interests, changes in ownership, taxation issues and other actions could be taken as Gurmale deemed necessary and appropriate in furtherance of the Clan's growth and business. The voluntary grant of broad powers to Gurmale, Lushman and Jeat was the Singh manner of doing business and resulted in the significant benefit to Grewal Clan family members who benefitted from the hard work, dedication and business acumen of their Clan leader.

The Clan business model was implemented from the very beginning by Gurmale, Lushman and Jeat with the goal of growing the Singh enterprise and providing for the members of the Clan both in the United States and in India. This was how Gurmale, Lushman and Jeat intended the Singh family business to operate and how they did operate for a significant period of time. [Footnotes and citations to the record omitted.]

Disputes among the Grewal family members regarding their respective business interests ultimately arose and form the basis for the lawsuit giving rise to this appeal. As relevant to this appeal, plaintiffs filed a 12-count second amended complaint alleging oppression of minority ownership rights, common law and statutory conversion, breach of contract, breach of fiduciary duties and aiding and abetting in the breach of fiduciary duties against Gurmale, Lushman, Jeat, Slemmer, Kilgore and Kenneth Clarkson, professional negligence/breach of fiduciary duty against Slemmer, Kilgore and Clarkson, and unjust enrichment. Plaintiffs requested an accounting, judicial supervision of dissolution distributions pursuant to MCL 450.1851 and

450.4805, and also alleged that defendants engaged in fraudulent transfers in violation of the Uniform Fraudulent Transfer Act, MCL 566.31 *et seq.*[1]

Defendants subsequently filed a 118-page counterclaim containing 40 counts. The various counts alleged by defendants included, among others, fraudulent representation, silent fraud, embezzlement, common law and statutory conversion, unjust enrichment, breach of fiduciary duty, and embezzlement of ownership interests. As relevant to this appeal, the arbitrator observed that Counts XV to XL of the counterclaim "pertain[ed] to conduct of . . . in relationship to what has been commonly referred to as the 'India Operations[ ]'" and that with regard to these specific counts, plaintiffs alleged statutory and common law conversion of property and profits, embezzlement of money and profits and unjust enrichment. Also relevant to this appeal, the arbitrator did not find in favor of defendants with respect to any of the counts alleged in their counterclaim. With respect to defendants' claims regarding their interests in property and assets held in India, the Arbitrator stated that it could not render a substantive ruling on these claims, and that defendants would need to pursue these claims in the proper forum in India. However, as will be discussed in more detail later in this opinion, the arbitrator did indicate that defendants were "entitled to an accounting as to the assets acquired in India[.]"

After almost two years of arbitrating this dispute, the arbitrator submitted a 104-page opinion to the parties on January 17, 2017. As a general matter, the arbitrator discussed the factual underpinnings of this case and noted that problems within the Grewal family begin to percolate in 2002, when some of the younger or Gen II members of the Clan were seen as not fully contributing to the family business, concerns were raised with regard to their attitude of entitlement to receiving proceeds of the family's good fortune and it was becoming clear that the Clan business model was not working for everyone in the family. During the same time period, Gurmale, Lushman and Jeat were sending significant funds to India to allow the Grewal family members there to purchase land and invest in business entities, such as a seed business and a brick factory, but over time, Gurmale's attempts to retain supervision of these assets and to glean information about them were less and less successful. As a result of these issues, the family members began to discuss "decoupling" the families' business interests moving forward. At one point, some irregular activity with how Pargat and Darshan were using their business accounts was noticed, and as the need to separate the family's business interests became more apparent, different business entities were created.

After an economic downturn in 2006, Grewal family members spoke to Darshan about having to cut back on his expenses, but he ignored these directives. Subsequently, plans were discussed not only to separate from family members in India, but also to separate from the families of Pargat and Darshan in the United States. While Gurmale, Lushman and Jeat had discussions with Darshan to help him create his own independent businesses, these discussions were not fruitful. In 2007, defendants stopped sending money to family in India for financial investments where information regarding these investments was not forthcoming from the family

---

[1] Effective April 10, 2017, the Act was renamed the Uniform Voidable Transactions Act. 2017 PA 552.

members in India. Darshan was repeatedly encouraged to limit his lavish lifestyle, and in 2009 defendants became aware that Darshan was engaging in irregular financial activity, such as opening unauthorized bank accounts. When defendants undertook an investigation into Singh Homes, which Darshan was supervising, other "questionable transactions" came to light, such as where Singh Homes issued a check to a friend of Pargat and Darshan's in excess of $10,000 for a real estate brokerage fee that was not substantiated. Darshan was subsequently terminated from his employment on April 16, 2010. After his termination, a new business entity was created by defendants and assets were transferred from other existing Singh business entities to this new business entity.

In 2010, the Department of Housing and Urban Development (HUD) began an investigation of Singh Homes regarding loan documentation that had been signed by Pargat. After HUD determined that a certification provided by Pargat was inaccurate, Singh Home's ability to obtain financing through HUD was suspended, which was a "serious detriment to the Singh organization with far reaching impact on the entirety of the organization financially." As a result of the issues with HUD, as well as other questionable financial conduct by Pargat, such as adding himself as an employee to another family business and drawing a salary without authorization, his employment was terminated in April 2011. After Pargat's termination, a new business entity for the Singh family was created, PSG Holdings, LLC, and defendants used their authority pursuant to the powers of attorney to transfer interests from the Singh family trusts to the new entity, but Pargat and Darshan were not given a financial stake in PSG Holdings, LLC. In 2010 and 2011, the Grewal family members in the United States officially cut ties with the family members in India. Subsequent attempts by defendants to reach a resolution with Pargat and Darshan to officially decouple the family in the United States were unsuccessful and in 2013, a forced buy-out of Darshan and Pargat's business interests took place. Plaintiffs subsequently filed suit in the Oakland Circuit Court on November 26, 2013.

With respect to the counts in the second amended complaint alleging statutory and common law conversion, the arbitrator concluded that while the evidence did not rise to the level of establishing statutory conversion, the evidence did support a conclusion that defendants "converted [plaintiffs'] interests under a theory of common law conversion."

> Where the Defendants made transfers of Plaintiffs' interests which were excessive, and upon demand refused to return same, the Defendants have committed a conversion of Plaintiffs' property. Accordingly, as to Plaintiffs' claims that the Defendants committed common law conversions of their property, the Arbitrator finds in favor of the Plaintiffs. Again, however, the Plaintiffs' own conduct must be considered and has been taken into consideration by the Arbitrator in fashioning the award to Plaintiffs as to their claims.

Addressing plaintiffs' claims alleging unjust enrichment, the arbitrator found that "[d]efendants have been unjustly enriched as a result of their conduct."

> Over the years, the Defendants caused transfers to be made of the Plaintiffs' interests in different manners, at different times to serve different purposes. The evidence showed that transfers and adjustments among and between the entities with regard to ownership interests would be made for taxation and other purposes.

This is the type of activity that went on regularly in the Singh enterprise and with the Plaintiffs' knowledge and acquiescence. However, the regular transfers that occurred in this regard were done without eliminating the ownership interest of the Plaintiffs or if that occurred, Plaintiffs did not object to same based on other off-setting actions being taken that were obviously acceptable to the Plaintiffs.

However, when the Defendants began to take actions to begin the decoupling process which included making transfers of Plaintiffs' interests with the intent and purpose of off-setting the value of property in India that Defendants believed were taken away from them, the Defendants exceeded their authority and the Arbitrator finds that the Defendants were unjustly enriched as a result.

The Defendants were authorized to make transfers using the very broad powers of attorney granted to them and also in their capacity as Trustee of Plaintiffs' Family Trusts. However, given the circumstances that existed at the time and in light of the disputes between Gurmale, Lushman and Jeat and those in the MSG family of the Grewal Clan, i.e. Pargat, Darshan, Ajmer and Balwinder and their children, over the future of Singh, the Arbitrator finds that Defendants' actions of making transfers which resulted in the elimination of interests that had been historically owned by the Plaintiffs resulted in the unjust enrichment of the Defendants.

The Arbitrator finds in favor of the Plaintiffs as to their claim for Unjust Enrichment with respect to transfers of interests undertaken by the Defendants that occurred in 2009 and beyond whereby the transfer purported to totally eliminate the Plaintiffs' interest in the transferred Singh entity. [Record citations omitted.]

The arbitrator also found that defendants Lushman, Gurmale and Jeat breached their fiduciary duties to plaintiffs by using the powers of attorney granted to them by plaintiffs to divest plaintiffs of their business interests.

As relevant to this appeal, the arbitrator also ordered defendants to pay "a reasonable attorney fee" to plaintiffs, the prevailing parties. After the parties filed post-arbitration briefs, the arbitrator issued its post-arbitration order regarding attorney fees. After considering the arguments made on behalf of both plaintiffs and defendants, the arbitrator ruled, in pertinent part, as follows:

In issuing his Award, it was the Arbitrator's intent to award Plaintiffs their reasonable costs and attorney[ ] fees as a component of damages in addition to the monetary damages awarded based on the willful and wanton conduct of the Defendants that was undertaken with a total disregard of the Plaintiffs' rights.

In their Second Amended Complaint, the Plaintiffs plead [sic] facts sufficient to support a claim for exemplary damages and specifically requested the award of exemplary damages in their prayer for relief. . . . The Arbitrator has found that the Defendants committed independent intentional torts which support

-10-

the award of exemplary damages having found that the Defendants committed conversion, were unjustly enriched and that Defendants Gurmale and Lushman breached their fiduciary duties to the Plaintiffs.

> As the Arbitrator has found that the Defendants committed an intentional wrongdoing and the record is replete with evidence demonstrating the willful and wanton conduct of the Defendants undertaken in disregard of the Plaintiffs' rights, the Arbitrator holds that the Plaintiffs are awarded Exemplary Damages in the form of an award of reasonable attorney fees and costs in an amount to be determined. The Arbitrator shall amend the Award to include the amount of the exemplary damages to be awarded to Plaintiffs and the factual and legal basis for the award of same as required by the Michigan Arbitration Act. However, to do so, the Arbitrator must first determine the amount to be awarded.

Following the filing of briefs by the parties and a hearing on the matter,[2] the arbitrator issued its opinion and award regarding attorneys' fees and costs as exemplary damages to plaintiffs in the amount of $4,969,463.94. Following briefing in the trial court on the issues whether the accounting portion of the arbitration award should be corrected and the exemplary damages confirmed, the trial court entered an order (1) striking the provisions of the arbitration award ordering plaintiffs to provide an accounting of property and assets held in India and (2) confirming the award of attorney fees and costs as exemplary damages. Defendants now appeal as of right.

## II. STANDARDS OF REVIEW

This Court will review de novo a trial court's decision regarding a motion to vacate or modify an arbitration award. *Vyletel-Rivard v Rivard*, 286 Mich App 13, 19-20; 777 NW2d 722 (2009), app dis 486 Mich 1060 (2010). However, "[j]udicial review of an arbitrator's decision is narrowly circumscribed." *City of Ann Arbor v American Federation of State, Co & Muni Employees (AFSCME) Local 369*, 284 Mich App 126, 144; 771 NW2d 843 (2009). More specifically, courts are not permitted to review an arbitrator's findings of fact. *Id*. In *City of Ann Arbor*, 284 Mich App at 144-145, this Court set forth the following important principles of law of relevance when reviewing an arbitrator's decision:

> Likewise, a reviewing court cannot engage in contract interpretation, which is an issue for the arbitrator to determine. *Konal v Forlini*, 235 Mich App 69, 74; 596 NW2d 630 (1999). Nor may a court substitute its judgment for that of the arbitrator. *Gordon Sel–Way, Inc v Spence Bros, Inc*, 438 Mich 488, 497; 475 NW2d 704 (1991). "[H]ence [courts] are reluctant to vacate or modify an award when the arbitration agreement does not expressly limit the arbitrators' power in some way." *Id*. The inquiry for the reviewing court is merely whether the award was beyond the contractual authority of the arbitrator. *Police Officers Ass'n of*

---

[2] The parties both waived holding an evidentiary hearing and relied on their briefs and oral submissions to the arbitrator.

*Michigan* [*v Manistee Co*, 250 Mich App 339, 343; 645 NW2d 713 (2002)]. If, in granting the award, the arbitrator did not disregard the terms of his or her employment and the scope of his or her authority as expressly circumscribed in the contract, " 'judicial review effectively ceases.' " *Id.*, quoting *Lincoln Park v Lincoln Park Police Officers Ass'n*, 176 Mich App 1, 4; 438 NW2d 875 (1989). Thus, " 'as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority,' " a court may not overturn the decision even if convinced that the arbitrator committed a serious error. *Michigan Ass'n of Police v City of Pontiac*, 177 Mich App 752, 760; 442 NW2d 773 (1989), quoting *United Paperworkers Int'l Union, AFL–CIO v Misco, Inc*, 484 US 29, 38; 108 S Ct 364; 98 L Ed 2d 286 (1987).

Where defendants contend that the doctrine of judicial estoppel is applicable in this case, this Court reviews this issue de novo. *Szyszlo v Akowitz*, 296 Mich App 40, 46; 818 NW2d 424 (2012).

## III.  ANALYSIS

### A..  THE ARBITRATOR'S ORDER THAT PLAINTIFFS ACCOUNT FOR ALL PROPERTY AND ASSETS HELD IN INDIA

On appeal, defendants argue that the trial court erred in correcting the portion of the arbitration award that ordered plaintiffs to provide an accounting of all assets and property held in India.  We disagree.

The statute that authorizes the trial court to correct an arbitration award is MCL 691.1704,[3] which provides, in pertinent part, as follows:

(1) On motion made within 90 days after the moving party receives notice of the award under [MCL 691.1699] or within 90 days after the moving party receives notice of a modified or corrected award under [MCL 691.1700], the court shall modify or correct the award if any of the following apply:

(a) There was an evident mathematical miscalculation or an evident mistake in the description of a person, thing, or property referred to in the award.

(b) *The arbitrator has made an award on a claim not submitted to the arbitrator and the award may be corrected without affecting the merits of the decision on the claims submitted.*

(c) The award is imperfect in a matter of form not affecting the merits of the decision on the claims submitted.

---

[3] MCL 691.1704 is part of the Uniform Arbitration Act (the Act), MCL 691.1681 *et seq*.

(2) If a motion made under subsection (1) is granted, the court shall modify or correct and confirm the award as modified or corrected. Otherwise, unless a motion to vacate is pending, the court shall confirm the award.

(3) A motion to modify or correct an award under this section may be joined with a motion to vacate the award. [Emphasis added.]

In ruling on defendants' motion to confirm the portion of the arbitration award that contained the provision regarding the assets held in India, the trial court also cited MCL 691.1703(1)(d). However, a review of the trial court's bench ruling and resultant order reflects that the trial court's decision was based on its determination that correction of the arbitration award was warranted pursuant to MCL 691.1704(1)(b). However, because the trial court cited MCL 691.1703(1)(d) as support for its decision, we will also address this statutory provision in our analysis. MCL 691.1703 provides the trial court with authority to vacate an arbitration award and states, in pertinent part:

(1) On motion to the court by a party to an arbitration proceeding, the court shall vacate an award made in the arbitration proceeding if any of the following apply:

* * *

(d) *An arbitrator exceeded the arbitrator's powers.* [Emphasis added.][4]

"[A]rbitrators have exceeded their powers whenever they act beyond the material terms of the contract from which they primarily draw their authority, or in contravention of controlling principles of law." *Washington v Washington*, 283 Mich App 667, 672; 770 NW2d 908, 912 (2009), quoting *Dohanyos v Detrex Corp (After Remand),* 217 Mich App 171, 176; 550 NW2d 608 (1996). In *Gordon Sel-Way*, 438 Mich at 496, the Michigan Supreme Court articulated principles of law that assist in determining whether an arbitrator failed to adhere to the terms of the governing contract:

. . . [I]t is the parties' contract which defines and limits their rights and duties and the arbitration clause or agreement which confers upon the arbitrators their authority to act. Since arbitrators derive their authority from the parties' contract and arbitration agreement, they are bound to act within those terms.

Moreover, claims of alleged arbitrator error are viewed carefully to "ensure that they are not being used as a ruse to induce this Court to review the merits of the arbitrator's decision." *Norlund & Assoc, Inc v Village of Hesperia*, 288 Mich App 222, 230; 792 NW2d 59 (2010).

As a preliminary matter, defendants claim that plaintiffs' challenges to the arbitrator's order mandating an accounting with respect to the India assets are time-barred. Notably, defendants point out that, from the issuance of the arbitration award, plaintiff had 20 days to

---

[4] MCR 3.602 is the companion court rule to MCL 691.1703 and MCL 691.1704.

request that the arbitrator modify or correct the award, and 90 days to move the trial court for such relief. MCL 691.1700(1)(2); MCL 691.1703(2); MCL 691.1704(1). While the lower court record does support defendants' position that plaintiffs did not adhere to the statutory timelines, the record also reflects that during the pertinent time periods, the parties were engaged in settlement discussions and were seeking clarification from the arbitrator with respect to its ruling and had agreed to extend applicable statutory deadlines. For example, on February 28, 2017, the arbitrator issued an order requiring the parties to file supplemental briefs on issues in dispute following the issuance of the arbitrator's January 17, 2017 award, one of which was attorney fees and costs, and the arbitrator also noted in the order that it reserved the right to conduct an evidentiary hearing on tax and attorney fee issues if necessary. Moreover, the arbitrator's order provided, in pertinent part, as follows:

> Pursuant to Authority under Sections 20 and 24 of the Arbitration Act, MCL 691.1700 & 691.1704, the Arbitrator will discuss with the Hon. James Alexander withdrawing or amending the Court's February 1, 2017 order, which currently requires the parties "to file motions to confirm or vacate the arbitration award by March 1, 2017," in order to permit the Arbitrator and the Parties to complete the items identified in this Post-Arbitration Order No. 1 pursuant to the Arbitration Act.

On March 10, 2017, in compliance with the arbitrator's February 28, 2017 order, the parties both filed supplemental briefs with the arbitrator on the issue of attorney fees. Plaintiffs filed an additional brief on March 29, 2017 on the issue of attorney fees. After the arbitrator issued its opinion regarding attorney fees on April 26, 2017, the parties ended up settling the case, but their August 15, 2017 stipulated order regarding partial settlement clearly provides that the parties reserved "all of their rights" to challenge the January 17, 2017 arbitration award "relating to the Defendants' request for an accounting of India land and/or assets[.]" The record reflects that the parties agreed on more than one occasion to extend the statutory deadlines during settlement negotiations. Accordingly, where the parties agreed to wait to file substantive motions challenging the January 17, 2017 arbitration award until after the majority of the case had settled, defendants' assertions that plaintiffs' challenges to the accounting portion of the arbitration award are time-barred are unpersuasive.

Turning to the merits of defendants' argument, in addressing Counts XV to XL of defendants' counterclaim, the arbitrator recognized that defendants alleged, and plaintiffs did not deny, that defendants sent money "to parties in India for the purpose of purchasing land and also to begin business enterprises such as a seed factory and a brick factory." Defendants had also alleged that cash and gold, in which defendants claimed shares, had been seized by plaintiffs, and that defendants' interests in land, the seed and brick factories and the profits from both businesses were "converted or embezzled by the Plaintiffs." Specifically, defendants alleged statutory and common law conversion of property and profits, unjust enrichment, and embezzlement of money and profits. The arbitrator, following a status conference with the parties in which the nature of the India claims was discussed, ruled that it did not have jurisdiction over matters that implicate ownership interests of property held in India.

> The Arbitrator lacks jurisdiction to determine who the actual titled and current owners of the India assets are both historically and today. He further

-14-

lacks jurisdiction to determine the ownership interests of the Parties under Indian law concerning the India assets. However, the Arbitrator does have jurisdiction to make certain rulings that do not require him to interpret or apply Indian law.

The arbitrator further recognized that the Singh family business was operated pursuant to the "clan" concept, and that the record reflected a conclusion that the parties would share in all assets in India just as they would in the United States. Specifically, the arbitrator concluded that "[t]he amount of money sent, to whom, for what purpose it was used, and what the intended or agreed upon allocation of ownership would be for same must be decided based on Indian law and cannot be decided in this Arbitration."

However, the Arbitrator does find that the Defendants do in fact, have some interest in the assets located in India and therefore are entitled to the equitable relief of an accounting from Plaintiffs as to the Indian assets and property so that the Defendants may pursue their claims as to what their interests are in those assets in India.

In determining whether the arbitrator (1) exceeded its powers beyond the terms of the parties' agreement compelling this case to arbitration and (2) rendered an award on a claim that had not properly been submitted to it, we must consider the terms of the March 19, 2015 stipulated order regarding arbitration. Specifically paragraph 10 of the stipulated order provides, in pertinent part, as follows:

10. This Court retains jurisdiction as appropriate under the Michigan Uniform Arbitration Act to (1) enforce its prior orders, (2) issue and enforce all necessary subpoenas for discovery or to secure witnesses for the arbitration hearing, (3) *address and resolve requests by any party for equitable relief and to adjudicate all equitable claims asserted in this case*; and (4) issue or enforce injunctions as needed.

The terms of the stipulated order regarding arbitration clearly specify that the trial court, as opposed to the arbitrator, reserved to itself the authority to adjudicate matters requiring equitable relief. As the trial court aptly recognized, an accounting is a form of equitable relief. See *Boyd v Nelson Credit Centers, Inc*, 132 Mich App 774, 779; 348 NW2d 25 (1984) (recognizing that "[a]n action for an accounting is equitable in nature[.]") "Since arbitrators derive their authority from the parties' contract and arbitration agreement, they are bound to act within those terms." *Gordon Sel-Way*, 438 Mich at 496. As the Michigan Supreme Court has clarified, "the parties' contract is the law of the case in this context." *Id*. Therefore, where the parties agreed that the trial court alone would address matters requiring equitable relief, the arbitrator did in fact (1) address a claim not properly submitted to it, and (2) exceed the scope of its ambit as set forth in the parties' contractual agreement referring the matter to arbitration. This is not a case where the trial court substituted its judgment for that of the arbitrator, but rather one where the trial court corrected an award that was made where express language in the parties' agreement precluded such an award. See *id*. at 497 (recognizing that "an award will be presumed to be within the scope of the arbitrators' authority absent express language to the contrary.") Moreover, where the trial court was able to rectify the matter without "affecting the merits of the decision on the claims submitted[,]" MCL 691.1704(1)(b), it appropriately

-15-

corrected the arbitration award in compliance with the Act. Additionally, while defendants direct this Court's attention to MCL 691.1701(3) which allows the arbitrator to "order remedies that the arbitrator considers just and appropriate under the circumstances[,]" and would likely include equitable relief, this argument overlooks the clear terms of the March 19, 2015 stipulated order regarding arbitration, which clearly reserves the resolution of requests involving equitable relief to the trial court.

On appeal, as they did in the trial court, defendants advance a novel argument, asserting that plaintiffs are precluded from arguing that the arbitrator could not order an accounting with respect to the India assets pursuant to the doctrine of judicial estoppel. In *Duncan v Michigan*, 300 Mich App 176, 190; 832 NW2d 761, app dis 494 Mich 879 (2013) this Court explained the theory underlying the doctrine of judicial estoppel.

> Judicial estoppel prevents a party from asserting one position when that party successfully and unequivocally asserted a position in a prior proceeding that is wholly inconsistent with the position now taken. Significantly, the mere assertion of inconsistent positions is not sufficient to invoke estoppel; rather, there must be some indication that the court in the earlier proceeding accepted that party's position as true. Further, in order for the doctrine of judicial estoppel to apply, the claims must be wholly inconsistent. This prior success model focus[es] less on the danger of inconsistent claims, than on the danger of inconsistent rulings. [*Id.* (citations and quotation marks omitted).]

The thrust of defendants' argument on appeal is that where plaintiffs submitted their equitable claims to the arbitrator for decision, they are now judicially estopped from arguing that the arbitrator did not have authority to order an equitable remedy and direct plaintiffs to render an accounting with respect to the assets at issue held in India. However, as this Court recognized in *Duncan*, for the doctrine of judicial estoppel to be applicable, the alleged divergent claims at issue must be "wholly inconsistent." *Id.* We acknowledge that in their second amended complaint, plaintiffs alleged claims against defendants that were equitable in nature, such as unjust enrichment, and that plaintiffs also sought equitable relief. However, we would not characterize plaintiffs' positions as *wholly* inconsistent, where in the arbitration, while plaintiffs did request equitable relief on their equitable claims, plaintiffs also sought and received monetary damages, a legal remedy, to redress their grievances against defendant. See, e.g., *Madugula v Taub*, 496 Mich 685, 699; 853 NW2d 75 (2014) (observing that damages are considered a legal, as opposed to an equitable remedy); *Meisner Law Group PC v Weston Downs Condo Ass'n*, 321 Mich App 702, 726; 909 NW2d 890 (2017) (recognizing that while a plaintiff may advance an equitable theory of recovery, the plaintiff may also seek legal relief in the form of money damages as redress). Consequently, where plaintiffs have not taken "wholly inconsistent" positions with respect to the arbitrator's ability to order equitable relief, defendants' allegation that the doctrine of judicial estoppel is applicable is without merit. Accordingly, the trial court correctly exercised its authority pursuant to MCL 691.1704(1)(b) in correcting the arbitrator's award.

## B. EXEMPLARY DAMAGES

On appeal, defendants next argue that the trial court erred in awarding plaintiffs' attorney fees and costs as exemplary damages. We disagree.

To the extent that defendants challenge the arbitrator's authority to order exemplary relief as part of its arbitration award, the governing statute is MCL 691.1701, which provides, in pertinent part:

(1) An arbitrator may award punitive damages or other exemplary relief if such an award is authorized by law in a civil action involving the same claim and the evidence produced at the hearing justifies the award under the legal standards otherwise applicable to the claim.

(2) An arbitrator may award reasonable attorney fees and other reasonable expenses of arbitration if such an award is authorized by law in a civil action involving the same claim or by the agreement of the parties to the arbitration proceeding.

* * *

(5) If an arbitrator awards punitive damages or other exemplary relief under subsection (1), the arbitrator shall specify in the award the basis in fact justifying and the basis in law authorizing the award and state separately the amount of the punitive damages or other exemplary relief.

As an initial matter, for the arbitrator to award exemplary relief, such an award must be authorized by law as if in a civil action involving the same claim. MCL 691.1701(1). The arbitrator concluded that plaintiffs successfully alleged a claim of common law conversion, "[w]here the [d]efendants made transfers of Plaintiffs' interests which were excessive, and upon demand refused to return same[.]" The arbitrator also found in favor of plaintiffs on Count IV of their second amended complaint, which alleged breach of fiduciary duty against Gurmale, Lushman, and Jeat. The arbitrator reasoned that where defendants held powers of attorney given by plaintiffs, a fiduciary relationship was created, and defendants were obligated to act in plaintiffs' best interests. The arbitrator further found that "[d]efendants caused transfers of Plaintiffs' interests to be made from entities in which the Plaintiffs held an interest into entities in which Plaintiffs held no interest or otherwise could not control or access." The arbitrator concluded that once the parties began to have a dispute regarding their interests, defendants' use of their fiduciary powers of attorney "could not reasonably be considered to be for the benefit of the principals . . . to which Defendants owed their duty." Under such circumstances, the arbitrator concluded that defendants' actions were "excessive and in violation of their fiduciary duties." The arbitrator thus found that Gurmale and Lushman breached their fiduciary duties owed to plaintiffs "as they pertain to the transfers made of Plaintiffs' interests to the holding companies and/or entities in which Plaintiffs hold no interests." Finally, the arbitrator concluded that plaintiffs were successful on their claim alleging unjust enrichment where defendants repeatedly made transfers of plaintiffs' business interests, and where after the "decoupling" process, the transfers were made with the intention of "off-setting the value of property in India that Defendants believed were being taken from them." In the view of the arbitrator, "[d]efendants were unjustly enriched as a result."

Exemplary damages are recoverable in Michigan to provide compensation to the plaintiff, as opposed to punishing the defendant. *Kewin v Massachusetts Mut Life Ins Co*, 409 Mich 401, 419; 295 NW2d 50 (1980). The purpose of exemplary damages is to "render the plaintiff whole." *Hayes-Albion v Kuberski*, 421 Mich 170, 187; 364 NW2d 609 (1984). In *Kewin*, the Michigan Supreme Court surveyed earlier case law from that Court and observed that cases allowing the recovery of exemplary damages "as an element of damages involve tortious conduct on the part of the defendant." *Id*.

> An award of exemplary damages is considered proper if it compensates a plaintiff for the "humiliation, sense of outrage, and indignity" resulting from injuries "maliciously, wilfully and wantonly" inflicted by the defendant. The theory of [the cases reviewed] is that the reprehensibility of the defendant's conduct both intensifies the injury and justifies the award of exemplary damages as compensation for the harm done the plaintiff's feelings. [*Kewin*, 409 Mich at 419 (citation omitted).][5]

To recover exemplary damages, there must be a showing that the defendant acted maliciously or with such willful and wanton behavior that he or she "demonstrate[d] a reckless disregard" of the plaintiff's rights. *McPeak v McPeak* (*On Remand*), 233 Mich App 483, 488; 593 NW2d 180 (1999). Exemplary damages may be recovered in both legal and equitable actions "where the plaintiff pleads malicious and wilful conduct." *Id*. at 489. This Court has also recognized that exemplary damages are not limited to compensation for "injured feelings" but may also be awarded "to compensate for injuries not capable of precise computation resulting from malicious conduct." *Joba Const Co, Inc v Burns & Roe, Inc*, 121 Mich App 615, 643; 329 NW2d 760 (1982). As a result, under "proper circumstances" corporations have been able to recover exemplary damages. *Id*.

When reviewing an award of exemplary damages, this Court is required to discern whether the award is "oppressive[.]"

> No rule can be laid down properly measuring or limiting the damages allowable in cases where exemplary damages may be recovered, except, as has been said, "they must not be oppressive, or such as shock the sense of fairminded men;" but the jury must understand in all cases that they are not justified in going beyond an amount that shall fairly compensate the party entitled to them. [*Oppenhuizen v Wennersten*, 2 Mich App 288, 298; 139 NW2d 765 (1966), quoting *Stuyvesant v Wilcox*, 92 Mich 233, 242; 52 NW 465 (1892).]

---

[5] These cases generally involve intentional torts. *Id*. at 419. The *Kewin* Court went on to observe that, unless an allegation is made and proof of tortious conduct independent of a breach of contract is established, exemplary damages are not permitted for breach of a commercial contract. *Id*. at 420-421. The theory underlying this rule is that the plaintiff is adequately compensated when damages are awarded for the breach of contract. *Id*. at 420.

On appeal, defendants do not directly challenge the ability of the arbitrator to award attorney fees as exemplary damages, rather their primary criticism is that the arbitrator did not make the requisite factual findings before awarding exemplary damages. Contrary to defendants' allegations in their brief on appeal, in its opinion ordering the payment of the attorney fees as exemplary damages, the arbitrator took great care to note that exemplary damages were warranted where the record reflected that defendants acted willfully, wantonly, maliciously and in complete disregard of plaintiffs' rights. See also MCL 691.1701(5) (requiring that where an arbitrator awards exemplary relief it must "specify in the award the basis in fact justifying and the basis in law authorizing the award[.]"). Defendants invite us to second-guess the arbitrator's factual findings, particularly with regard to the arbitrator concluding that plaintiffs suffered "humiliation and [indignation]" where defendants refused to defend Pargat in proceedings involving HUD. However, such action by this Court would exceed the scope of this Court's review.

Finally, while we are aware that the award of costs and attorney fees in the form of exemplary damages in the amount of $4,969,463.94 is substantial, aside from a cursory statement in their brief on appeal that "[d]efendants disagree that [p]laintiffs' fees were reasonable or adequately supported by the evidence [plaintiffs] submitted," defendants do not advance a substantive legal argument supported by pertinent facts with regard to the reasonableness of the attorney fees awarded. Indeed, without citing legal authority, defendants simply assert that the arbitrator's award of attorney fees was in some manner "disconnected" from the damages plaintiffs incurred and that any award of attorney fees must be limited to the claims on which the arbitrator determined plaintiffs were successful, being unjust enrichment, breach of fiduciary duty and common law conversion. In support of this claim, defendants point our attention to the arguments they raised at the June 28, 2017, hearing held before the arbitrator with respect to plaintiffs' costs and attorney fees, where, as pertinent to this argument on appeal, defendants argued that any attorney fees and costs plaintiffs were permitted to recover should be limited to "the claims upon which they prevailed[.]" However, defendants do not provide legal support for their claim, and in *Smith v Khouri*, 481 Mich 519, 522, 532-533; 751 NW2d 472 (2008) (opinion of TAYLOR, C.J.), the Michigan Supreme Court clarified that a reasonable attorney fee is discerned by multiplying a reasonable hourly rate "by the reasonable number of hours expended" and the Court's opinion did not otherwise limit the amount of hours expended to those attributable to a plaintiff's successful claims. Specifically, the *Smith* Court reasoned, in pertinent part:

> In considering the time and labor involved (factor 1 under MRPC 1.5 [a] and factor 2 under *Wood*) the court must determine the reasonable number of hours expended by each attorney. The fee applicant must submit detailed billing records, which the court must examine and opposing parties may contest for reasonableness. The fee applicant bears the burden of supporting its claimed hours with evidentiary support. If a factual dispute exists over the reasonableness of the hours billed or hourly rate claimed by the fee applicant, the party opposing the fee request is entitled to an evidentiary hearing to challenge the applicant's evidence and to present any countervailing evidence. [*Smith*, 481 Mich at 532 (opinion of TAYLOR, C.J.)]

The Michigan Supreme Court has adhered to this analysis in subsequent decisions following *Smith*. See, e.g., *Pirgu v United Servs Auto Ass'n*, 499 Mich 269, 275, 281; 884 NW2d 257 (2016) (recognizing that once a trial court determines a reasonable hourly rate, it is required to multiply that rate by the "reasonable number of hours expended in the case[.]")

In reviewing the arbitrator's award of attorney fees and costs, it is important to note that the arbitrator enumerated the factors that are to be weighed with respect to determining the reasonableness of attorney fees as set forth in *Wood v DAIIE,* 413 Mich 573; 321 NW2d 653 (1982) and *Smith*, 481 Mich at 528-534 (opinion of TAYLOR, C.J). After undertaking a detailed analysis with respect to the reasonableness of the hourly rates charged by each attorney working on the case, the arbitrator also considered whether the amount of hours billed for the services rendered by plaintiffs' attorney were reasonable. Notably, apparently in response to defendants' claims that plaintiffs ought not to be reimbursed for attorney fees not related to the claims that were presented to the arbitrator, the arbitrator concluded that the hours of attorney Mahesh Nayek of Dickinson Wright should be reduced by 153 hours where that amount of time could be attributed to his work on federal trademark litigation matters. The arbitrator also considered the time of attorney John S. Artz, and noted that while some of his time was spent on trademark matters, his work was "heavily intertwined" with the other factual issues related to the claims presented in the arbitration, and that reimbursement for 100 hours of his time was reasonable. Where the arbitrator found that plaintiffs charged for an attorney's time that was duplicative, it did not hesitate to order that plaintiffs not be compensated for the time. For example, where the work of attorneys was limited to trademark matters, the arbitrator stated that recovery of the fees for their time would not be permitted. Once the arbitrator determined a reasonable hourly rate for the attorneys that worked on plaintiffs' behalf and that the time expended was reasonable, the arbitrator weighed the remaining *Wood* factors as well as the factors set forth in MRPC 1.5 in fashioning its ultimate award. Specifically, the arbitrator stated, in pertinent part, as follows:

> The skill, time and labor that was necessarily involved to represent the Plaintiffs in this case was tremendous. Likewise, the difficulty of the case and the challenges it presented to Plaintiffs' counsel to pursue same was equally immense. With more than two hundred parties, hundreds of thousands of pages of documents exchanged, three pending lawsuits involving hundreds of millions in assets, complex claims implicating international, federal and state law, coupled with various family and cultural concerns and a complex entity structure practiced by the Defendants, it was prudent and necessary that the Plaintiffs' attorneys expended the efforts they did to achieve success for the Plaintiffs. The Arbitrator finds that these factors (the time, skill, labor and difficulty of the case) support his finding as to the reasonableness of the fees and hourly rates charged, and that no adjustment upwards or downwards is warranted under the circumstances.

Thus, where the arbitrator rendered an award of attorney fees in the form of exemplary damages that was authorized by Michigan law and adhered to the governing state law precedent in fashioning an award of reasonable attorney fees, the trial court correctly confirmed the award.

Affirmed.  Plaintiffs, as the prevailing parties, may tax costs pursuant to MCR 7.219.

/s/ Kirsten Frank Kelly
/s/ Michael J. Riordan
/s/ Jonathan Tukel